**UNITED STATES of America, Appellee,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Appellant.**

No. 85–3456.
Misc. No. 11710.

United States Court of Appeals, Third Circuit.

Argued March 4, 1986.

Decided April 14, 1986.

Herbert L. Fenster (argued), Thomas C. Papson, McKenna, Connor & Cuneo, Washington, D.C., for appellant.

Richard K. Willard, Asst. Atty. Gen., J. Alan Johnson, U.S. Atty., John Cordes, Robert L. Ashbaugh (argued), U.S. Dept. of Justice, Washington, D.C., for appellee.

Before ALDISERT, Chief Judge, SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Under a 1982 statute, the Inspector General of the Department of Defense (Inspector General) is charged with combating fraud, waste, and abuse. To discharge that duty, Congress gave the Inspector General broad subpoena power. This appeal, presenting an issue of first impression in the appellate courts, requires us to consider the contours of that power.

At the request of a separate auditing agency within the Department of Defense, the Inspector General issued a subpoena for internal audit reports of Westinghouse Electric Corporation (Westinghouse). Westinghouse contends that the Inspector General impermissibly used his subpoena power on behalf of another agency, and that the subpoena was unreasonably broad. The district court, 615 F.Supp. 1163, held the subpoena enforceable. Because we agree that the subpoena was authorized by the statute creating the Inspector General's office and not unduly broad, we affirm.

I.

The Inspector General Act of 1978 established an office of inspector general in 15 federal departments and agencies. 5 U.S.C. app. § 1 *et seq.* (1982). The enactment reflected congressional concern that fraud, waste and abuse in United States agencies and federally funded programs were "reaching epidemic proportions." S.Rep. No. 1071, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 2676, 2679. To attack the problem, audit and investigative functions within each of the departments were centralized under one high-level official, an Inspector General, who was given broad powers to seek out fraud and waste in agency operations and programs. 5 U.S.C.App. §§ 2, 4. In agencies with existing auditing or investigative units, the functions of these units were transferred to an Inspector General, 5 U.S.C.App. §§ 2, 4. To carry out the statutory mandate, each Inspector General was entrusted with the power to subpoena all information "necessary in the performance of the functions assigned by this Act." 5 U.S.C. app. § 6(a)(4).

One department excluded from the reach of the 1978 Act was the Department of Defense, which, unlike some of the other federal agencies, had long maintained a large audit and investigative staff assigned to various units within the Department. By 1982, however, Congress had come to believe that centralization of audit and investigative efforts within Defense was also necessary. As a result, the Defense Authorization Act of 1982 contained a provision amending the Inspector General Act of 1978 to create an Inspector General within the Department of Defense.

The provisions of the 1982 Act, however, varied somewhat from the 1978 model. Under the 1982 Act, Congress did not consolidate all existing audit and investigative units under an Inspector General. 5 U.S.C. app. §§ 8(c), 9(c). It did, though, make clear that the Inspector General was to play the central role. Thus, it stipulated that he would be the principal adviser to the Secretary of Defense for "matters re-

lating to the prevention and detection of fraud, waste and abuse" in the department, 5 U.S.C.app. § 8(c)(1), would "provide policy direction for audits and investigations," *id.* at § 8(c)(3), and would "monitor and evaluate the adherence of Department auditors" to audit policies, *id.* at § 8(c)(6). More specifically, the 1982 Act authorized the Inspector General to "investigate fraud, waste and abuse uncovered as a result of other contract and internal audits, as the Inspector General considers appropriate," *id.* at § 8(c)(4), and to "request assistance as needed from other audit, inspection, and investigative units of the Department of Defense," *id.* at § 8(c)(8).

One of the major existing audit agencies not transferred to the Inspector General's direct control was the Defense Contract Audit Agency (DCAA), which is charged both with auditing and assisting in the negotiation of defense contracts. In June and July, 1983, the Inspector General undertook a review of the DCAA that focused on the adequacy of the DCAA's audits of private defense contractors. Among other areas, the Inspector General inquired into whether DCAA had access to contractors' internal audit reports. Through this inquiry it was learned that internal audit reports were not made available at six of the twenty-three contractor locations where the DCAA maintained offices. Later, four contractors agreed to permit some access, leaving only Westinghouse and one other company refusing to provide the reports to DCAA.

Apparently prompted by the Inspector General's probing, the DCAA in February, 1984 for the first time asked Westinghouse for permission to inspect its internal audit records. Westinghouse refused, contending that the agency's requests were not authorized by the access provisions of the department's contract with the company. After an exchange of letters, the DCAA in August, 1984 requested the Inspector General to issue a subpoena for the disputed documents. On September 28, 1984, the Inspector General issued a subpoena for all Westinghouse internal audits where the au-

diting costs were allocated to Department of Defense contracts or subcontracts.

In issuing the subpoena, the Inspector General designated the investigation as an investigation by his office, pursuant to a policy memorandum he had distributed the previous year. The Inspector General assigned an aide to follow the subpoena and to receive reports on information produced by it. But he requested that DCAA auditors carry out the investigation.

Westinghouse refused to comply with the subpoena, and the Inspector General initiated an enforcement proceeding in the district court. Essentially, the company maintained that the Inspector General lacked statutory authority to issue the subpoena on behalf of the DCAA and that the subpoena was overly broad. After limited discovery and oral argument, the district court on August 4, 1985, ruled that the Inspector General acted within his statutory mandate in issuing the subpoena, that it was not overly broad, and that it would be enforced. The district court stayed its enforcement order to allow this appeal to be heard.

## II.

At the crux of the dispute is the extent of the subpoena power of the Inspector General. The DCAA's right of access to the internal audit reports is not at issue here. That issue is being litigated separately in administrative proceedings before the Armed Services Board of Contract Appeals, and it has no bearing on this case.

 The general standards that determine the enforceability of an administrative subpoena are well established. Courts will enforce a subpoena if (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome. *See, e.g., United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964); *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). In addition, if a subpoena is issued for an

improper purpose, such as harrassment, its enforcement constitutes an abuse of the court's process. *See Pickel v. United States,* 746 F.2d 176, 185 (3d Cir.1984). *SEC v. Wheeling Pittsburgh Steel Corp.,* 648 F.2d 118, 125 (3d Cir.1981) (in banc).

■ Westinghouse's principal argument focuses on the Inspector General's statutory authority, which, it maintains, does not permit issuance of a subpoena to obtain documents for the DCAA. We conclude, however, that the subpoena was within the Inspector General's authority.

Under the statute, the Inspector General may require by subpoena all information "necessary in the performance of the functions assigned by this Act...." 5 U.S.C. app. § 6(a). Thus, we must determine whether the subpoena for the internal audit documents falls within the statutory functions assigned to the Inspector General.

The statute stipulates that the Inspector General may investigate fraud, waste and abuse uncovered as a result of other audits, *id.* at § 8(c)(2), and that he may request assistance from other audit, inspection and investigative units of the department, *id.* at § 8(c)(8). On its face, then, the statute would appear to authorize the Inspector General both to follow leads from other units of the Department of Defense, and to employ other Defense auditors in carrying out an investigation, as the Inspector General has done here.

Westinghouse, however, relies on legislative history in urging a contrary interpretation. The linchpin of its argument is found in the history of the 1978 Act, the legislation that created various inspectors general but not the Inspector General for the Department of Defense. The Committee report for the 1978 Act stated:

> The committee intends, of course, that the Inspector and auditor general will use this subpoena power in the performance of his statutory functions. The use of subpoena power to obtain information for another agency component which does not have such power would clearly be improper.

S.Rep. No. 1071, 95th Cong., 2d Sess. 34 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 2676, 2709.

This language, Westinghouse insists, shows that Congress intended that the Act "would not operate to alter existing access to records rights of other components of the affected agencies." In effect, the company appears to argue that any Inspector General subpoena which results in another Defense component gaining access to information it would not otherwise be able to obtain violates congressional intent.

We decline to accept Westinghouse's interpretation, however. First, it overlooks a critical difference between the 1978 and 1982 Acts. In the departments and agencies covered by the 1978 Act, the inspectors general were given all audit and investigative responsibilities. Thus, where the 1978 report referred to "other agency components," by definition it was referring to components not involved in auditing or investigating. Under the 1978 Act, within the affected departments only the inspectors general were to perform auditing and investigative functions. The 1982 Act created a different model: a department with an Inspector General, where several other units, or "components," within the department continued to perform auditing and investigative work. Because this configuration did not present itself in 1978, the reference in the Committee's report to other components would appear inapplicable to the Department of Defense.

Moreover, Westinghouse's reading of the legislation is inconsistent with the express language of the 1982 Act, which authorizes the Inspector General to utilize the personnel of other Defense audit and investigative agencies in carrying out its investigations. If Congress intended to allow investigators for other Defense units to assist the Inspector General, it must have realized that the other units would gain access to documents within the Inspector General's subpoena power. The excerpt from the 1978 legislative history relied upon by Westinghouse, then, does not support its argument that the subpoena issued here

was beyond the authority of the Inspector General.

Westinghouse also relies heavily on the decision by Congress in 1982 to exclude the DCAA from the Inspector General's direct control. Originally, the House bill would have transferred DCAA inspectors to the Inspector General's office. This provision was deleted on the House floor, however, by an amendment proposed by Congressman Stratton. 128 Cong.Rec. H4774-75 (daily ed. July 28, 1982). Stratton stated that "it is clear that the functions of the Inspector General were not intended to, and should not, include the type of audits performed by the DCAA—contract cost audits for the purpose of assisting in the negotiations, administration, and settlement of government contracts." *Id.*

It was this view, Westinghouse contends, that was enacted into law. However, in so arguing it ignores the House-Senate Conference report on the final version of the bill that was eventually enacted as the 1982 Act. H.R.Rep. No. 749, 97th Cong., 2d Sess. 176–77 (1982), *reprinted in* 1982 U.S. Code Cong. & Ad.News 1569, 1581–83 (Conference report on the 1983 Defense Authorization Act). The conferees, the report shows, agreed with Congressman Stratton that the Inspector General should not be involved in *negotiating* contracts, but they disagreed with him on the question of *auditing* contracts, and specifically contemplated that the Inspector General develop a contract audit capability. The report makes this distinction quite clearly:

> The conferees agree not to transfer any functions from the Defense Contract Audit Agency, however. Instead, the conferees agreed to direct the Secretary of Defense to transfer not less than 100 additional positions to the Office of Inspector General to be filled by the Inspector General with persons trained to perform contract audits. The conferees believe that it is essential that the new Inspector General develop a significant capability in the highly technical area of contract audit. The conferees do not intend that these auditors advise Department of Defense contracting officers in the process of *negotiating* contracts, a function that the Defense Contract Audit Agency auditors perform. The conferees envision the contract audit capability in the Office of Inspector General to be used (1) to provide the manpower and technical expertise to oversee effectively and review the work of the Defense Contract Audit Agency, and (2) to provide the Inspector General flexibility and resources in situations where he deems it necessary or appropriate to *look at entire procurements*—the performance of defense contractors as well as the performance of defense personnel.

H.R.Rep. No. 749, 97th Cong., 2d Sess. 176–77 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 1569, 1581–83. (emphasis added).

Before the Senate voted on the final bill, Senator Roth explained the "compromise Inspector General Amendment" that the conference committee had adopted. While noting that the committee had abandoned the plan to transfer the DCAA, he stated: "It is important to reiterate, however, that the DCAA will be required to comply with audit policies established by the Inspector General and that the agency is required under the compromise to work cooperatively with the Inspector General in efforts to fulfill responsibilities assigned to him." 128 Cong.Rec. S10654 (daily ed. Aug. 17, 1982).

In sum, the legislative history of the 1982 Act does not demonstrate an intent by Congress to prohibit the Inspector General from using his subpoena power through other investigative agencies within the Department of Defense, so long as the subpoena is otherwise within the Inspector General's power. Rather, the history reflects the clear intent, consonant with the powers expressly conferred on the agency by the statute, that the Inspector General both supervise and work with existing audit agencies, including DCAA.

Faced with this history and the statutory language, Westinghouse at oral argument took a somewhat different tack. While

conceding that the Inspector General had the statutory authority to "look at" Westinghouse, the argument ran, he was not doing that here. Rather, the Inspector General "was just issuing a subpoena." To evaluate this argument, we must consider whether, even assuming the Inspector General could properly subpoena Westinghouse's internal audit reports at the instance of the DCAA, and assuming he could assign the conduct of the investigation back to DCAA, the Inspector General's subpoena here was invalid because he did not exercise independent judgment in deciding to issue it, but rather merely rubber-stamped the DCAA's request that the subpoena issue.

Under the policy memorandum, the Inspector General will issue a subpoena only at the request of another Defense audit and investigative unit "[i]f the Inspector General determines the audit or investigation to be in furtherance of an Inspector General function...." App. at 464. In an affidavit and deposition before the district court, the Inspector General declared that he was motivated to seek access to Westinghouse's records by the company's adamant refusal to disclose the reports. "It was just a cold, stonewall, no, you can't have it. That made me very, very suspicio[us]." App. at 321. Specifically, he stated, he wanted to determine whether Westinghouse's accounting records, which establish the basis for costs in contracts negotiated by the government, were subject to internal manipulation; whether Westinghouse was effective in policing itself against fraud, waste and mismanagement; and whether Westinghouse was as vigilant in combating waste at federal contract segments, where the government bears much of the added costs, as it is at fully commercial segments, where the company must absorb extra costs. App. at 12. Also, because the cost of the audits is allocated to government contracts, the Inspector General explained, "I want to see what the government is getting for its money." App. at 13.

These statements were the subject of express findings by the district court,

which found "no evidence of any improper, even fragmentary, collusion" between the Inspector General and the DCAA, and characterized his "unimpeached and uncontradicted testimony" as "totally credible." It thus concluded that the Inspector General did independently decide that he wanted to subpoena Westinghouse's internal audit reports, for reasons of his own distinct from DCAA's. Beyond suggesting that the Inspector General's adoption of the DCAA inquiry and reassignment of that investigation to DCAA auditors amounts to a "sham," Westinghouse has offered no evidence to rebut this conclusion.

■ The question whether the Inspector General had an independent purpose in issuing the subpoena, as he testified, would appear to turn on an evaluation of the Inspector General's motive or intent. The district court's determination on this issue is a finding of fact, based on its distinctive ability to appraise the evidence, which may not be set aside unless "clearly erroneous." Fed.R.Civ.P. 52(a). *See, e.g., Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982); *Baker Industries, Inc. v. Cerberus, Ltd.,* 764 F.2d 204, 209–10 (3d Cir.1985); *United States v. Pittsburgh Trade Exchange, Inc.,* 644 F.2d 302, 306 (3d Cir. 1981). In view of the unrebutted testimony, we cannot say that the district court clearly erred in finding that Inspector General did exercise independent judgment in issuing the subpoena.

### III.

Even assuming that the Inspector General possesses the statutory authority to subpoena Westinghouse's internal audit reports, the company maintains that the subpoena here is deficient because it fails to state an investigative purpose against which its relevance may be measured, and that it is unreasonably broad. We are not persuaded by these arguments, either.

■ The subpoena issued to Westinghouse includes a preprinted portion which states that the documents are needed by

the Inspector General in carrying out his statutory responsibility to investigate fraud. Westinghouse argues that this is inadequate, citing a line of cases holding unenforceable a subpoena that contains *no* indication of its purpose. *See, e.g., Trailer Marine Transport Corp. v. Federal Maritime Commission,* 602 F.2d 379, 398 (D.C. Cir.1979). But a subpoena may be enforced where it recites the agency's statutory duties, and "the statutes themselves alert the parties to the purposes of the investigation...." *FTC v. Carter,* 636 F.2d 781, 787 (D.C.Cir.1980).

Here it is clear from the subpoena itself that it is issued to conduct audits and investigations relating to economy and the detection of fraud in defense programs. In addition, Westinghouse had an opportunity to challenge the subpoena at a hearing before the district court, *see United States v. Powell, supra,* 379 U.S. at 58, 85 S.Ct. at 255. *United States v. McCarthy,* 514 F.2d 368, 372 (3d Cir.1975), where the court developed an expanded record exploring the agency's purpose. This record demonstrates that Westinghouse received sufficient notice of the Inspector General's purpose in issuing the subpeona.

Westinghouse also contends that the subpoena is so broad that it exceeds the boundaries of the subpoena authority established in the Inspector General Act. It is clear that, given the measure of relevance applied in subpoena enforcement proceedings, the subpoena here would pass muster under the usual standard. *See United States v. Arthur Young & Co.,* 465 U.S. 805, 814, 104 S.Ct. 1495, 1501, 79 L.Ed.2d 826 (1984). *FTC v. Texaco, Inc.,* 555 F.2d 862, 872 (D.C.Cir.) (in banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). Accordingly, Westinghouse maintains that the Inspector General's subpoena authority is more restricted than that of other administrative agencies, and that his subpoena power should be construed more narrowly.

This proposition is based on the language of the Inspector General statute, which confers power to require by subpoena the production of all information "necessary in the performance of the functions assigned by this Act, ..." 5 U.S.C.App. § 6(c)(4). The word "necessary," the company argues, signals Congress's intention to restrict narrowly the Inspector General's subpoena power.

There is, however, no legislative history that suggests Congress intended by the use of this word to limit the scope of the Inspector General's subpoena power. A constricted interpretation would be at odds with the broad powers conferred on the Inspector General by the statute. Nor is the long line of decisions granting agencies wide latitude in their use of subpoenas grounded on the precise statutory language setting out their subpoena power. The "relevancy" standard derives from *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). There the Secretary of Labor issued a subpoena in administrative proceedings against a corporation under the Walsh-Healy Public Contracts Act. The district court held that the corporation's activities were not covered by the statute. The Supreme Court, however, held that the district court lacked authority to make that determination. The court was obliged to enforce the subpoena because it was not "plainly incompetent or irrelevant to any lawful purpose" of the Secretary under the Act. *Id.* at 509, 63 S.Ct. at 343. This standard has since been applied to numerous agencies. *See, e.g., United States v. Powell,* 379 U.S. 48, 57, 85 S.Ct. 248, 254, 13 L.Ed.2d 112 (1969) (Internal Revenue Service); *United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 363–64, 94 L.Ed. 401 (1950) (Federal Trade Commission); *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (Administrator of Fair Labor Standards Act).[1]

---

**1.** The basis for application of this standard was not the particular language bestowing subpoena power on the agency, but rather an analogy between the administrative inquiry and the grand jury, "which can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Powell,* 379 U.S. at 57, 85 S.Ct. at

■ In view of the well-established principle of deference to agency discretion in issuing subpoenas and in the absence of contrary legislative history, we believe Congress intended that the courts accept the Inspector General's determination of what information is "necessary to carry out the functions assigned by this Act" so long as the information is relevant to an Inspector General function.

■ The subpoena issued here required the production of records of internal audits that the government paid for through costs allocated to Department of Defense contracts or subcontracts. Westinghouse protests that the subpoena will require production of close to 80% of its internal audit reports. Because of the way in which the company's general and administrative costs are pooled and allocated, the only audit reports not covered by the subpoena are audits of business segments of the company which perform no government contracts *and* whose costs are pooled separately from audit business groups who audit segments with government contracts. Swept within the subpoena, as a result, are internal audit reports of business segments which perform *no* government work, but whose costs are pooled together with audit groups who audit segments with government contracts. Such audit reports cannot possibly be necessary or relevant to the Inspector General's duties. Westinghouse urges, since they are not related to Department of Defense programs.

This contention, however, is not well-supported. First, all of the audit reports sought are related to Department of Defense programs, in the sense that the Department pays some amount of money for them through the portion of general and administrative costs allocated to every government contract. More important, internal audits, even of business segments that do not themselves perform government contracts, may indicate how vigilant Westinghouse is in combating fraud, waste, and abuse and how it responds when irregularities are revealed. Such information is crucial to evaluating Westinghouse's fitness as a defense contractor.

Finally, Westinghouse's audit reports bear on the accuracy of its internal accounting systems. The Department of Defense, in turn, relies on those systems to determine costs which are properly charged to the government. A deficiency disclosed by an audit report of a solely commercial segment of the company, for instance, may well be reflected in government contracts as well, since the same accounting systems are frequently used throughout the company. Thus, as James Curry, the Assistant Inspector General for Audit Policy and Oversight, testified in the district court, where a deficiency in internal controls is found in a division of the company, "we would like to know about that because then the same deficiency surely would also exist at the division that has business with the government." App. at 259.

Accordingly, we concude that the subpoena is not unreasonably broad.

### IV.

To summarize, we hold that the Inspector General had the statutory authority to issue a subpoena at the request of the DCAA, so long as he did so in furtherance of a purpose within his statutory authority and exercised some independent judgment in deciding to issue the subpoena. We also conclude that the district court did not clearly err in crediting the Inspector General's stated purposes, and that those purposes came within his statutory authority. Finally, the subpoena was not unreasonably broad. Accordingly, the judgment of the district court will be affirmed.

255, (quoting *United States v. Morton Salt Co.,* 338 U.S. at 642–43, 70 S.Ct. at 363–64). That analogy applies with equal force here.