UNITED STATES of America,
Plaintiff–Appellant,

v.

NEWPORT NEWS SHIPBUILDING
AND DRY DOCK COMPANY,
Defendant–Appellee,

The Shipbuilders Council of America,
Amicus Curiae,

The Chamber of Commerce of the
United States, Amicus Curiae.

No. 87–3832.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 3, 1987.

Decided Jan. 19, 1988.

Peter Rolf Maier, U.S. Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Henry E. Hudson, U.S. Atty., Alexandria, Va., Leonard Schaitman, U.S. Dept. of Justice, Washington, D.C., John J. Quill, Kirk Moberley, Defense Contract Audit Agency on brief), for appellant.

John G. DeGooyer (K. Martin Worthy, Maureen Duignan, Theodore A. Howard, Helen Marie Lardner, Hamel & Park, Washington, D.C., Shannon T. Mason, Jr., Mason, Gibson, Cowardin & Martin, Newport News, Va., on brief), Washington, D.C., for appellee.

(Clarence T. Kipps, Jr., Robert K. Huffman, Alan C. Brown, Miller & Chevalier, Chartered, Washington, D.C., W. Patrick Morris, Vice President & Gen. Counsel Shipbuilders Council of America on brief), for amicus curiae Shipbuilders Council of America.

(Herbert L. Fenster, Thomas C. Papson, David M. Eppsteiner, Matthew J. McGrath, McKenna, Conner & Cuneo, Washington, D.C., Robert S. Conrad, National Chamber Litigation Center, Inc. on brief), for amicus curiae The Chamber of Commerce of the U.S. in support of Affirmance.

Before CHAPMAN and WILKINSON, Circuit Judges, and BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

WILKINSON, Circuit Judge:

This case concerns the scope of the subpoena power of the Defense Contract Audit Agency, which seeks to subpoena the internal audits of Newport News Shipbuilding and Dry Dock Company, a large defense contractor. We hold that the statutory subpoena power of the DCAA extends to cost information related to government contracts, but that the DCAA does not have unlimited power to demand access to all internal corporate materials of companies performing cost-type contracts for the government. Because the materials sought by DCAA are not within the scope of its statutory authority, we affirm the order of the district court denying enforcement of the subpoena in this case.

## I.

The DCAA was established by administrative order in 1965 as a separate agency in the Department of Defense. Its function is to assist DOD with audits, primarily of cost-type contracts, during the negotiation, administration, and settlement of the contracts. As a part of the audits, DCAA has the power to subpoena and inspect the books and records of contractors. It is the scope of DCAA's statutory authority to subpoena that is at issue here.

DCAA's subpoena authority is set forth in 10 U.S.C. § 2313(d)(1), which reads:

> The Director of the Defense Contract Audit Agency (or any agency) may require by subpoena the production of books, documents, papers or records of a contractor, access to which is provided by subsection (a) or by section 2306(f) of this title.

Sections 2313(a) and 2306(f) provide in relevant part:

§ 2313.

(a) An agency named in section 2303 of this title is entitled, through an authorized representative, to inspect the plant and audit the books and records of—

(1) a contractor performing a cost or cost-plus-a-fixed-fee contract made by that agency under this chapter; and

(2) a subcontractor performing any subcontract under a cost or cost-plus-a-fixed-fee contract made by the agency under this chapter.

§ 2306.

(f)(5) For the purpose of evaluating the accuracy, completeness, and currency of cost or pricing data required to be submitted by this subsection, any authorized representative of the head of the agency who is an employee of the United States Government shall have the right, until the expiration of three years after final payment under the contract or subcontract, to examine all books, records, documents and other data of the contractor or subcontractor related to the proposal for the contract, the discussions conducted on the proposal, pricing or performance of the contract or subcontract.

It is under these statutes that DCAA issued the subpoena that gave rise to this dispute.[1]

Also relevant to this case is the function of the DOD Inspector General. The DOD Inspector General was created in 1982. Congress had previously created Inspectors General in fifteen departments in the Inspector General Act of 1978. In those departments, the investigative and audit functions that had existed in other branches were transferred to the Inspector General. In DOD, however, the DCAA retained auditing and investigative functions, and the establishment of the Inspector General did not change DCAA's authority to obtain the records of contractors. The DOD Inspector General was, however, given broad subpoena powers to investigate waste, fraud, and other abuse, and the authority to set policy for audits and investigations. The Inspector General was also authorized to request help in performing its tasks from the other DOD auditing units such as DCAA. It has been held, and both parties appear to agree, that the Inspector General

---

1. In 1986, Congress recodified 10 U.S.C. § 2306(f)(5). Its content remains unchanged, but is now found in a new section 2306a(f). We will refer to the relevant statute as § 2306(f)(5), as has been done throughout this litigation.

*does* have the power to subpoena the internal audits at issue here. *See United States v. Westinghouse Electric Corp.*, 788 F.2d 164 (3d Cir.1986).

## II.

Newport News Shipbuilding and Dry Dock Company (NNS) performs shipbuilding and repair, primarily for the United States Navy. Approximately ninety-eight percent of its work is performed for the United States government. Many of NNS's contracts with the government are "cost" or "cost-plus" contracts, in which NNS's compensation is based on its cost or its cost plus a set fee.

NNS has since 1946 had an internal audit department. The nine auditors of the department function as an "independent management control" and conduct periodic reviews of the soundness and efficiency of various NNS departments. As the district court noted, the internal audit department serves NNS's corporate management by evaluating these departments and making recommendations for improving efficiency and safeguarding corporate assets. The auditors perform this function by reviewing employee time cards, subcontractor invoices, vouchers, summary cost records, and other evidence of direct and indirect costs. On completion of an audit, the auditors prepare a final report of their conclusions and recommendations for corporate management.

The internal audits are not conducted with regard to individual contracts, but address department performance over time on a number of projects. The costs of internal audits are charged as "general and administrative" overhead, which is allocated to government contracts in the same way as other overhead charges such as executive salaries. The costs of operating the internal audit department, including employee timesheets and other cost documentation from the department are all made available to the DCAA, which maintains a staff at Newport News Shipbuilding. Prior to this case, however, the DCAA had not sought to gain access to the

actual work product of the internal audit department.

Beginning in mid–1984, the DCAA sought access to NNS Internal Audit materials. In October 1986, DCAA served a subpoena duces tecum on NNS pursuant to 10 U.S.C. § 2313(d) demanding:

> Schedules of internal audits performed or expected to be accomplished, working papers generated during any audit, written summary reports on the results of audit, followup action taken by NNS in response to internal audit recommendations and any time-charging records of the employees assigned to the audit department for the period 1 January 1986 to present.

NNS refused to surrender the work product of the Internal Audit department, and filed a declaratory judgment action to have the subpoena declared unlawful. The government responded by moving to dismiss the NNS action and by seeking summary enforcement of the subpoena. The district court heard oral argument on March 9, 1987, and requested supplemental filings by the parties. On March 20, the court denied enforcement of the subpoena, holding under § 2306(f) that the Internal Audit materials were not related to the negotiation, pricing or performance of a particular defense contract, and were thus beyond the scope of DCAA's subpoena power. The court stated that the DOD Inspector General was the proper branch through which DOD could get access to the audits. *See Newport News Shipbuilding and Dry Dock Co. v. Reed*, 655 F.Supp. 1408, 1414–15 (E.D.Va.1987). From this ruling, the government appeals.

## III.

█ Federal courts will enforce an agency subpoena if (1) the inquiry is within the authority of the agency and is for a proper purpose; (2) the matter requested is reasonably relevant to the inquiry; and (3) the demand is not unreasonably burdensome or broad. *E.g., United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). Here, the subpoena is

deficient because it exceeds the proper scope of DCAA's statutory authority.

DCAA suggests that it is entitled to the NNS internal audits simply because NNS does ninety-eight percent of its business with the government. Although this argument has a certain common sense appeal, it has no basis in the statutes that govern DCAA's access to corporate documents. This argument contains no apparent limit on the records to which DCAA would have access, and no hint of how this justification for access would be workable in the case of a contractor performing a lesser percentage of government work. We therefore turn to the statutory provisions as the only proper source for DCAA's subpoena authority.

Our review of the relevant statutes leads us to reject the government's assertion that they give DCAA practically unlimited access to NNS's internal corporate records. On the contrary, sections 2313(a) and 2306(f)(5) provide DCAA access to corporate records primarily for the purpose of verifying the costs, including general and administrative costs, associated with the particular contracts being monitored by DCAA auditors.[2]

### A.

Turning first to 10 U.S.C. § 2313(a), we cannot agree with DCAA that the language of the statute alone provides a quick and simple solution in this case. Section 2313(a) allows DCAA to "inspect the plant and audit the books and records of a contractor performing a cost or cost-plus-a-fixed-fee contract." DCAA contends in essence that the statute gives it unlimited access to the corporate records of any company that performs even one cost-type contract. "Indeed, carried to its logical ex-

treme," the government's argument "would dictate that few, if any, of a private contractor's business records would be immune" from DCAA scrutiny. *See Bowsher v. Merck & Co.*, 460 U.S. 824, 836, 103 S.Ct. 1587, 1594, 75 L.Ed.2d 580 (1983).

We cannot find in the words of § 2313(a) a congressional intent to grant such sweeping power. The words "audit the books and records" suggest review of cost and financial data alone. Similarly, the words "performing a cost or cost-plus-a-fixed-fee contract" imply that the statute covers only materials related to the performance of that contract. The statutory language is neither broadly embracing nor narrowly restrictive of DCAA's authority. Phrases of inclusion, e.g., *"all* books and records," and phrases of limitation, e.g., *"only* those books and records," are both absent from the statutory text. It is anything but clear from the face of the statute that DCAA is entitled to the material it seeks. Where, as here, the "language does not dictate an answer," the court must "analyze the policies underlying the statutory provision to determine its proper scope." *Bowsher v. Merck & Co.*, 460 U.S. at 831 n. 7, 103 S.Ct. at 1592 n. 7.

The legislative history of § 2313(a) reveals that congressional concern was limited to providing government auditors with a means to verify the costs incurred in the performance of cost-type contracts. What is now codified as § 2313(a) was originally enacted as part of the Armed Services Procurement Act of 1947, Pub.L. No. 80–413, 62 Stat. 21, 23 (Feb. 19, 1948), *reprinted in* 1948 U.S.Code Cong.Serv. 22–23. The Act was a comprehensive revision and restatement of military procurement law. Although one function of the Act was to

---

**2.** 10 U.S.C. § 2313(d) allows DCAA to subpoena only documents to which it has access under 10 U.S.C. § 2313(a) or 10 U.S.C. § 2306(f)(5). Despite DCAA's argument in the district court that the terms of § 2313(d) itself granted DCAA access to the internal audits, both parties now agree that the passage of § 2313(d) in 1986 did not expand DCAA's access to corporate documents, but only provided subpoena power as an additional tool to get at the documents to which it was already entitled by sections 2313(a)

and 2306(f)(5). The legislative history of § 2313(d) supports this position, as it states that § 2313(d) "is not intended to expand the scope of books, documents, papers or records to which the defense contract audit agency presently has access." H.R.Rep. No. 81, 99th Cong., 1st Sess. 462, *reprinted in* 1985 U.S.Code Cong. & Ad.News 472, 616. The resolution of this case therefore depends on the construction of §§ 2313(a) and 2306(f)(5).

place limitations on the use of cost-type contracting, there is no mention in the congressional reports on the Act of access to contractors' records. *See* S.Rep. No. 571, 80th Cong., 1st Sess. (1947), *reprinted in* 1948 U.S.Code Cong.Serv. 1048.

The access-to-records provision that became § 2313(a) was introduced as a floor amendment by Senator Byrd of Virginia. Senator Byrd stated that the access-to-records provision was "designed to remedy the situation created by General Meyers in connection with the fraud he perpetrated on the government." 94 Cong.Rec. 79 (Jan. 12, 1948). The situation to which Senator Byrd referred involved the activities of General Bennett E. Meyers, a Deputy Chief of Procurement of Aircraft and Aircraft Parts. Meyers apparently had a financial interest in a defense subcontractor which produced aircraft parts. During his involvement with the subcontractor, the cost of Meyers' personal use of a Cadillac automobile and a $10,000 redecoration of Meyers apartment were allegedly charged by the subcontractor as business expenses. Business expenses were also charged for items such as travel that never actually took place. *See* Investigation of the National Defense Program: Hearings Before a Special Committee Investigating the National Defense Program, United States Senate, 80th Cong. 1st Sess. (1948) (Part 43: Aircraft Procurement, Activities of Gen. Bennett E. Meyers); *see also United States v. Meyers,* 171 F.2d 800 (D.C.Cir. 1948) (affirming Meyers' perjury conviction arising from these events).

Senator Byrd's statement, as the explanation of the sponsor of the amendment that became § 2313(a), is an "authoritative guide to the statute's construction." *North Haven Board of Education v. Bell,* 456 U.S. 512, 527, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982). Because Senator Byrd's statement constitutes the entire legislative history of his floor amendment, it is especially significant. His mention of the catalytic role of the Meyers scandal provides evidence that § 2313(a) was intended specifically to allow verification of the actual costs charged to the government by defense contractors. The provision was in-

tended to enable the government to determine whether charges made by cost-type contractors were in fact actually incurred for the purpose of performing the contract. There is no evidence that, as DCAA contends, § 2313(a) was meant to allow wide-ranging investigations into the general efficiency of any company that performs cost-type government contracts.

The DOD's own long-standing interpretation of § 2313(a) confirms our view of the statute's proper scope. Federal Acquisition Regulation § 15.106–2 "implements 10 U.S.C. § 2313(a)," by requiring that defense contracts contain a clause guaranteeing DCAA access to documents. This clause is found in Federal Acquisition Regulation § 52.215–2(a), 48 C.F.R. § 52.215–2(a) (1986). It reads:

> representatives of the Contracting Officer shall have the right to examine and audit—books, records, documents, and other evidence and accounting procedures and practices, sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred in performing this contract.
>
> This right of inspection shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

The implementing regulation's emphasis on information needed to "reflect properly all costs" incurred on "this contract" confirms that § 2313(a) should be construed principally to provide access to cost information related to particular contracts. While the government contends that this regulation does not define the full breadth of DCAA's subpoena authority, we are not at liberty to ignore this longstanding interpretation of the agency's right of access.

In sum, we are unable to find in the language of the statute, in its legislative history, or in its implementing regulations, the kind of sweeping subpoena authority that DCAA seeks to assert in this case.

### B.

■ The other statute on which DCAA relies, 10 U.S.C. § 2306(f)(5), is also limited

in scope. Section 2306(f)(5) provides access to "all books, records, documents, and other data of the contractor or subcontractor related to the proposal for the contract, the discussions conducted on the proposal, pricing or performance of the contract or subcontract" where such materials are necessary "for the purpose of evaluating the accuracy, completeness, and currency of cost or pricing data."

Certain limits on DCAA's subpoena power are therefore apparent on the face of § 2306(f)(5). First, the material must be necessary for reviewing the "accuracy, completeness, and currency of cost or pricing data." Second, the requirement that the materials used for this purpose be "books, records, documents, and other data" indicates that the statute reaches objective factual information concerning contract costs, such as invoices, vouchers, and time logs, rather than the subjective assessments sought in this case. Finally, the material covered must be related to the specific contract involved.

The legislative history of § 2306(f)(5) reinforces this interpretation of the statutory text. Section 2306(f)(5) was enacted in 1968 as an amendment to the Truth in Negotiations Act, which provided for verification of cost and pricing information submitted by contractors during the contracting process. The legislative history states repeatedly that the provision was intended to allow review of "cost and pricing data" through access to "actual records of performance." *See* S.Rep. No. 1506, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 3589. The Comptroller General's letter of support for the legislation includes, as examples of such records, "quotations from vendors and plans to purchase automatic equipment"—clearly objective cost verification data. 1968 U.S.Code Cong. & Ad.News at 3593.

The legislative history also states that § 2306(f)(5) "would enact into law the current regulations on the subject." 1968 U.S. Code Cong. & Ad.News at 3591. These regulations had provided that the government should conduct "post-award" audits based on actual records of performance in

addition to "pre-award audits" based solely on the data submitted during negotiations. The Defense Department circular announcing the new post-award audit regulations stated that the audits were to be based on "actual performance records" and emphasized that the audits were "limited to the single purpose of determining whether or not defective cost or pricing data were submitted." Defense Procurement Circular No. 57, November 30, 1967, *reprinted in* BNA Federal Contracts Report, No. 198 at E–1 (December 4, 1967).

Statements of the sponsoring legislators during debate on § 2306(f)(5) further confirm its limited scope. Senator Proxmire stated that the provision would allow "postaudit investigations of a contractor's cost data" so as to protect against a "contractor's failure to disclose vital cost information at the time the contract was awarded." 114 Cong.Rec. 26331 (1968). Representative Minshall stated that the legislation would provide for postaudits of *"financial records."* 114 Cong.Rec. 11783 (1968) (emphasis added).

Finally, the implementing regulations for § 2306(f)(5) reveal that the reach of the statute has been understood to be limited. The regulation calls for access to "all documents necessary to permit adequate *evaluation of the cost of pricing data* submitted." Federal Acquisition Regulation § 52.215–2(b), 48 C.F.R. § 52.215–2(a) (1986) (emphasis added). This regulatory interpretation, the legislative history, and the language of the statute itself delimits the scope of DCAA's subpoena authority. Section 2306(f)(5) was meant to provide access to materials needed for factual verification of cost and pricing data, including those pertaining to general and administrative costs, that are related to particular government contracts.

### IV.

 We agree with the district court that NNS's internal audits are not the type of documents that fall within the scope of DCAA's subpoena power. Several reasons combine to support this conclusion.

The internal audits are not related to any particular government contract. The record shows that the internal audits are conducted not of particular contracts but of the performance of NNS operational units over the course of many contracts. The internal audits are neither based on information related to a particular contract nor are their costs charged to a particular contract.

The contents of the internal audits further place them beyond the scope of DCAA's subpoena power. The audits are not mere compilations of contract cost charges and the underlying documentation. Rather, the audits contain the internal audit staff's subjective evaluation of various areas of NNS's operations and its suggestions for changes. Sections 2313(a) and 2306(f)(5) are clearly aimed at access to objective data supporting cost charges paid by the government. The NNS internal audits are not this type of data.

DCAA argues that it must have access to the work product of the internal audit department—the audits themselves—in order to determine whether the costs of the department have been properly charged to the government as general and administrative overhead. We disagree. It is uncontested that DCAA already has access to all of the cost data of the internal audit department and its supporting documentation. DCAA therefore is able to review timesheets, expense vouchers, invoices for materials, travel expenses, and the like. DCAA is entitled to this type of objective cost data in order to verify general and administrative overhead costs, and these are the type of materials that are useful for verification of the actual costs of the internal audit unit. The notion that the government is not really interested in the substantive content of the internal audits but only in whether those audits were produced in a cost-effective manner strains credulity. The admitted need to verify the propriety of the costs charged to the government as general and administrative expenses does not justify a subpoena of the actual work product of the auditors whose expenses are under review.

The implications of DCAA's argument further show why we cannot accept it. Under DCAA's view, the work product of any NNS unit whose costs constitute general and administrative expenses must be made available to DCAA so that it may see whether the government is "getting its money's worth." Yet the salaries of the executives of NNS, its board members, and its legal counsel are all charged as general and administrative expenses. DCAA is surely entitled to review the salaries of these NNS employees, but it does not require access to the work product of each of them in order to perform its cost accounting function.

We cannot agree with DCAA that its cost-accounting function will be undermined if it is not given access to the internal audits. DCAA appears to contend that if its subpoena power is limited to cost data that is related to a particular contract, contractors will be able to keep "books and records from DCAA's scrutiny by labelling them as overhead and by fashioning their internal audits so as to prevent linkage between an audit and a specific contract." Contractors may not, however, define costs according to their own purposes in this way. Regulations define the proper allocation of costs to particular categories and the allocation of overhead costs to individual government contracts. *See* 48 C.F.R. §§ 31.202, 31.203 (1986). DCAA seeks the audits not because they contain cost data, but because they contain the conclusions produced by the NNS internal audit staff.

We are similarly unpersuaded by DCAA's contention that it cannot properly conduct its audits without reviewing NNS's internal audits of its own accounting procedures. Regulations require that a contractor's accounting practices be disclosed to the government. *See* 4 C.F.R. §§ 400–401 (1986). The record shows that DCAA has access to all of the same original cost information that the NNS internal auditors would use in reviewing NNS accounting practices. DCAA is therefore fully able to conduct a review of the effectiveness of NNS's accounting practices. What it cannot do under §§ 2313(a) or 2306(f)(5) is demand access to the analysis contained in

the confidential work product of NNS's own audit staff.

We emphasize that DCAA enjoys extremely broad access to NNS's records. DCAA maintains a large on-site staff at NNS. DCAA auditors, as authorized by §§ 2313(a) and 2306(f)(5), are able to inspect NNS's plant and to review all of the costs claims by NNS and the documentation supporting those claims. There is no basis in the record for any suggestion that NNS's refusal to grant access to its internal audits is an attempt to withhold information needed by DCAA to verify actual costs. Cost verification data, not the work product of internal auditors, is the proper subject of a DCAA subpoena. DCAA performs a critical auditing mission, but it is not running the company.

## V.

■ Our holding is entirely consistent with the allocation of functions between the auditing and investigatory branches of the Department of Defense and with the important federal interest in limiting the costs of military procurement. Throughout its argument, DCAA has emphasized the need to combat waste, fraud, and inefficiency in defense contracting. There *is* a DOD branch authorized to undertake the type of broad investigation into efficiency that DCAA wishes to conduct at NNS: the DOD Inspector General. Although we emphasize that the subpoena power of the Inspector General is not before us today, we note that the Inspector General is specifically directed by statute to "investigate fraud, waste, and abuse." 5 U.S.C.App. 3, § 8. In performing this function, the Inspector General has the broad power to subpoena evidence defined only as that "necessary in the performance of the functions assigned by this Act." *Id.* § 6. Thus, where the interests of the government require broad investigations into the efficiency and honesty of a defense contractor, the Inspector General is equipped for this task. *See United States v. Westinghouse Electric Corp.*, 788 F.2d 164 (3d Cir.1986) (Inspector General, on making an independent judgment that documents are needed for an investigation, has extremely broad power to subpoena them).

The DCAA, on the other hand, performs a no less important, but different, function—cost auditing for the purpose of assisting in the negotiation and administration of defense contracts. *See* 32 C.F.R. § 357.2 (1986). As then DOD Deputy Secretary Frank Carlucci testified at hearings on the DOD Inspector General legislation, the "nature of the DCAA's work is not consistent with the function of an Inspector General." Inspectors General Legislation: Hearings Before the Senate Committee on Governmental Affairs, 97th Cong., 1st Sess. pt. 2, at 14 (1981). The DCAA cannot rely on Congress' grant of broad powers to the Inspector General to claim for itself an equivalent role.

The procurement system, of which DCAA is part, relies on private contractors for the production of materials needed for the national defense. Like other private firms, these contractors have an interest in maintaining the confidentiality of their internal communications. This may be especially true with regard to functions such as internal auditing, which rely for their effectiveness on the candor that confidentiality allows. Nonetheless, the government, by statute or contractual provision, may certainly demand access even to materials such as these. This access must, however, be based on a specific authorization. We can find no such authorization for DCAA's subpoena of the NNS internal audits.

The order of the district court denying enforcement of the subpoena is hereby

AFFIRMED.