**Robert REICH, Secretary of Labor, Plaintiff–Appellant,**

v.

**GREAT LAKES INDIAN FISH AND WILDLIFE COMMISSION, Defendant–Appellee.**

No. 92–4035.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1993.

Decided Aug. 27, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 9, 1993.

Steven J. Mandel, Allen H. Feldman, Dept. of Labor, Appellate Litigation, Washington, DC, William J. Stone, Ellen L. Beard (argued), U.S. Dept. of Labor, Office of the Sol., Washington, DC, for plaintiff-appellant.

James E. Zorn, Great Lakes Indian Fish & Wildlife Com'n, Odanah, WI, Douglas B.L. Endreson (argued), Anne D. Note, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for defendant-appellee.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

The Department of Labor asked the district court to enforce a subpoena directed against the Great Lakes Indian Fish and Wildlife Commission, seeking evidence that the Commission is violating the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, which so far as relevant here requires employers to pay employees one and a half times their regular wages for work in excess of forty hours a week. The district judge refused to enforce the subpoena, on the ground that the Commission is not subject to the Act. The Department has appealed. Its first argument, which need not detain us long, is that the court should have enforced the subpoena without resolving the question of statutory coverage, instead deferring the question until and unless the Department proceeded against the Commission for violations of the Act. If it were doubtful whether the Commission was failing to pay time and a half for overtime, or if the question whether the Commission is subject to the Act could not be resolved without the information sought by the subpoena, the deferral suggested by the Department would be proper. Neither condition is satisfied. The Commission admits that it does not pay time and a half for overtime; and the question of statutory coverage is independent of any informa-

tion that the subpoena might produce, as it is a question purely of law. The Commission should not be burdened with having to comply with a subpoena if, as the district court believed, the agency issuing it has no jurisdiction to regulate the wages that the Commission pays. Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage. *EEOC v. Cherokee Nation*, 871 F.2d 937 (10th Cir. 1989); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165–66 (4th Cir.1988); *EEOC v. Ocean City Police Dept.*, 820 F.2d 1378 (4th Cir.1987); *FTC v. Shaffner*, 626 F.2d 32, 36 (7th Cir.1980); *United States v. Frontier Airlines, Inc.*, 563 F.2d 1008, 1009 (10th Cir.1977); cf. *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 216, 66 S.Ct. 494, 509, 90 L.Ed. 614 (1946). Compliance with a subpoena is a burden, and one that a person or institution that can show it is not subject to the regulatory regime in aid of which the subpoena was issued should not be required to bear. Cf. *id.* at 217, 66 S.Ct. at 509.

The Great Lakes Indian Fish and Wildlife Commission is a consortium of thirteen Chippewa Indian tribes that inhabit the Great Lakes region. The Commission was created in 1984 in order to enforce the usufructuary rights that the Chippewas retained under a series of nineteenth-century treaties with the United States. *Sokaogon Chippewa Community v. Exxon Corp.*, 2 F.2d 219, 224 (7th Cir.1993); *Lac Courte Oreilles Band v. Voigt*, 700 F.2d 341, 362–65 (7th Cir.1983). The Chippewa surrendered in these treaties most of their rights to the occupation of land outside of Indian reservations, but retained the right to use a great deal of that land for traditional Indian activities (which incidentally have a religious as well as economic significance for the Indians), such as fishing for walleye pike and muskellunge, hunting deer and moose, and gathering wild rice and the sap of maple trees, provided that they could do these things without prejudice to lawful occupiers of the land. Today these retained rights, though greatly curtailed by the spread of white occupation, still extend over tens of thousands of square miles in states abutting the Great Lakes. The Great Lakes

Indian Fish and Wildlife Commission supervises these activities. It fixes hunting, fishing, and gathering seasons for the various species of animal and plant covered by the usufructuary rights, sets limits on the amounts and type of catch permitted, and polices compliance with its regulations. The last function is the most labor intensive. It consists not only of assuring that Indian hunters, fishers, and gatherers do not exceed the authorized catch, use unauthorized methods, or fish, hunt, or gather out of season, but also of protecting the Indians from interference by white hunters, fishers, and gatherers. Many white people in the Great Lakes region as elsewhere in the United States either do not understand or do not accept the privileges that the Indian treaties grant Indians. Forbidden themselves to spear fish, for example, white fishermen resent the fact that Indians are permitted to do so. This resentment sometimes boils over into violence. Hence the field employees of the Commission are not only uniformed but also armed. They are in fact a combination of game wardens and policemen. The State of Wisconsin has deputized them to exercise state as well as tribal law enforcement functions in the areas that they patrol.

The work of the Commission is seasonal because the usufructuary rights that it administers are seasonal. And during the seasons for fishing and hunting the principal species, the work of the Commission's field employees—its game warden police—takes place virtually round the clock, not only because the hours of daylight are long and hunting and fishing take place throughout them, but also because the Indians like to spear fish at night, by torchlight. The seven-day-a-week, twenty-four-hour-a-day character of the work of these Indian police is similar to that of law enforcement officers generally, only accentuated by the seasonality of the Commission's responsibilities. If employed by state or local governments these police would have no federal legal entitlement to time and a half for overtime; their employer would be free within broad limits not only to substitute compensatory time off for overtime premium pay but also to measure hours worked by a work month rather

than a work week, so that an employee who worked more than 40 hours in a particular week would not be entitled even to compensatory time off unless he had exceeded 160 hours in the entire month. 29 U.S.C. §§ 207(k), 207(o). Because the Fair Labor Standards Act does not mention Indians, the Department of Labor takes the position that these exemptions are inapplicable to the warden-policemen of the Great Lakes Indian Fish and Wildlife Commission. The Department's able counsel acknowledged at argument that the difference in treatment between these tribal law enforcement officers and state or local policemen makes no sense, but contended that the difference can be erased only by Congress. She added reassuringly that it was only a question of money. The Commission's activities are financed primarily by a grant from the Department of the Interior, and if the Commission is required to pay its warden-policemen overtime it can always ask the Department for additional funding and the Department can in turn ask Congress for a supplemental appropriation.

Indian treaties are deemed the legal equivalent of federal statutes and they can therefore be modified or even abrogated by Congress. *United States v. Dion*, 476 U.S. 734, 738, 106 S.Ct. 2216, 2219, 90 L.Ed.2d 767 (1986). Nevertheless, partly no doubt out of a sense of guilt for the mistreatment of Indians by the U.S. government, partly in recognition that Indian tribes like states retain at least vestiges of sovereignty, and partly perhaps as a straightforward application of the "canon of construction" that repeals by implication are disfavored, the presumption is that a statute does not modify or abrogate Indian treaty rights. *Id.* at 738–40, 106 S.Ct. at 2219–20; *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690, 99 S.Ct. 3055, 3076, 61 L.Ed.2d 823 (1979). The Fair Labor Standards Act does not mention Indians. It was enacted in 1938, at a time when Indian problems were not at the forefront of the national policy agenda. Nothing in the legislative history suggests that Congress thought about the possible impact of the Act on Indian rights, customs, or practices. If therefore the Chippewa had a treaty

right to employ law enforcement officers on any terms, the Fair Labor Standards Act would be presumed not to abrogate the right by forcing the Great Lakes Indian Fish and Wildlife Commission to pay time and a half for overtime. Cf. *EEOC v. Fond du Lac Heavy Equipment & Construction Co.*, 986 F.2d 246 (8th Cir.1993); *Donovan v. Navajo Forest Products Industries*, 692 F.2d 709 (10th Cir.1982). But one searches the treaties in vain for such a right. So far as pertains to this case the only rights granted are rights to hunt, fish, and gather. There is no mention of the system for enforcing these rights, let alone any reference to the terms of employment of those hired to enforce it.

But we cannot end our consideration of the appeal with that observation. The ultimate question is the meaning fairly to be attributed to the Fair Labor Standards Act. Obviously the Act is broadly enough worded to apply to the Commission's warden-policemen without semantic strain. Indeed, read literally against the background of the exemption for state and local law enforcement officers, it covers the Commission's law enforcement officers because the Commission is not a state or local agency. And literal readings of statutes—readings that refuse to take into account any ambiguities that are not visible on the face of the statute—are rather in vogue in the Supreme Court these days, see, e.g., *Connecticut National Bank v. Germain*, ─── U.S. ───, ───, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991); William N. Eskridge, Jr., "The New Textualism," 37 *UCLA L.Rev.* 621 (1990), despite what might seem compelling objections. *Herrmann v. Cencom Cable Associates, Inc.*, 978 F.2d 978, 982 (7th Cir.1992). The Department of Labor's invocation of the "plain meaning" canon, however, is parried by the Commission's invocation of the canon that not only treaties but (other) federal statutes as well are to be construed so far as is reasonable to do in favor of Indians. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766–68, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753 (1985); *EEOC v. Cherokee Nation, supra*, 871 F.2d at 939. And even

literalists do not interpret statutes literally when doing so would produce a result senseless in the real world. E.g., *Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 527–30, 109 S.Ct. 1981, 1994–95, 104 L.Ed.2d 557 (1989) (concurring opinion). Even literalists, that is to say, acknowledge the applicability to statutes of the principle of contract interpretation that allows the court to seek meaning beneath the semantic level not only when there is an "intrinsic" ambiguity in the contract but also when there is an "extrinsic" one, that is, when doubt that the literal meaning is the correct one arises only when one knows something about the concrete activities that the contract was intended to regulate. *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 620–21 (7th Cir.1989). In *Citicorp Industrial Credit, Inc. v. Brock,* 483 U.S. 27, 107 S.Ct. 2694, 97 L.Ed.2d 23 (1987), a case in which the Supreme Court refused to recognize an implicit exemption to the Fair Labor Standards Act, the Court did not stop with the "plain language" of the Act, but went on to examine the legislative intent. *Id.* at 36, 107 S.Ct. at 2700.

The Department of Labor's lawyer acknowledges what we have described as the statutory analogue of extrinsic ambiguity. A literal reading of the Fair Labor Standards Act would create a senseless distinction between Indian police and all other public police. Nothing in the Act alerts the reader to the problem; you have to know that there are Indian police to recognize it. But once it is recognized, the Act, viewed as a purposive, rational document, becomes ambiguous, creating room for interpretation. We cannot think of any reason other than oversight why Congress failed to extend the law enforcement exemption to Indian police, especially when engaged in the sort of seasonal activities in which the defendant's warden-police engage; more important, no reason has been suggested to us. The Department's lawyer speculated that the Indians must simply have failed to lobby for an exemption; and we know that in legislation as in other areas of life it is the squeaky wheel that gets oiled. As she also said, it is only a question of money, and maybe the Commission can get more money from Congress, although Congress is not at the moment in a very giving

mood. It is only a question of money for state and local policemen as well, yet we can imagine the howls that would go up from the state and local law enforcement community if Congress tried to repeal its exemption from the overtime provisions of the Act.

The case for exempting the tribal policemen is stronger than that for exempting ordinary police. We mentioned the intensely seasonal character of their work. An additional consideration is that even though there is no treaty right to employ law enforcement officers on whatever terms the tribal organization sets and the officers are willing to accept, it has been traditional to leave the administration of Indian affairs for the most part to the Indians themselves. They have their own courts, their own tribal governments, their own police. It is true that these institutions are mainly for the regulation of the reservations, but the exercise of usufructuary rights off the reservation is as important to the Indians as the exercise of their occupancy rights within the reservations and maybe more so, since only about a third of all Indians live on reservations. An effective system of property rights, we have long been reminded by skeptics about laissez-faire, depends upon regulations establishing and enforcing those rights. Robert L. Hale, "Coercion and Distribution in a Supposedly Non-Coercive State," 38 *Pol.Sci.Q.* 470 (1923); Cass R. Sunstein, *After the Rights Revolution: Reconceiving the Regulatory State* 20 (1990). The warden-policemen of the Great Lakes Indian Fish and Wildlife Commission are an important element of the scheme for regulating Indian property rights. The courts have spoken of the "inherent sovereignty" of Indian tribes and have held that it extends to the kind of regulatory functions exercised by the Commission with respect to both Indians and non-Indians. *South Dakota v. Bourland,* —— U.S. ——, ——, 113 S.Ct. 2309, 2319, 124 L.Ed.2d 606 (1993); *Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981); *United States v. Wheeler,* 435 U.S. 313, 325, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978). The idea of comity—of treating sovereigns, including such quasi-sovereigns as states and Indian tribes, with greater respect

than other litigants—counsels us to exercise forbearance in construing legislation as having invaded the central regulatory functions of a sovereign entity.

■ Of course the Indians have no *constitutional* immunity from such intrusion; after *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), even the states do not. But even when it has no constitutional backing, comity is a proper consideration in statutory interpretation. So the Supreme Court has held in insisting that if Congress wants to alter the traditional balance between the states and the federal government it make its intention unmistakable. *United States v. Bass*, 404 U.S. 336, 349–50, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989); *Gregory v. Ashcroft*, — U.S. —, —, 111 S.Ct. 2395, 2403, 115 L.Ed.2d 410 (1991). Our dictum in *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 936 (7th Cir. 1989), that "federalism uniquely concerns States; there simply is no Tribe counterpart," goes too far. Indian tribes, like states, are quasi-sovereigns entitled to comity. Comity argues for allowing the Indians to manage their own police as they like, even though no treaty confers such prerogatives, until and unless Congress gives a stronger indication than it has here that it wants to intrude on the sovereign functions of tribal government.

The Department's lawyer argued that application of the overtime provisions of the Fair Labor Standards Act would benefit the Commission's law enforcement officers, who are of course themselves Indians, even if it hurt their employer. Well, it might, but then again it might not—for there is a lively debate over whether regulations of the employment relation such as minimum wage and overtime regulations actually benefit the ostensible beneficiaries, since by making labor more expensive such regulations may cause disemployment. See, e.g., *Mechmet v. Four Seasons Hotel, Ltd.*, 825 F.2d 1173, 1176 (7th Cir.1987); Finis Welch, *Minimum Wages: Issues and Evidence* (1978); *The Economics of Legal Minimum Wages* (Simon Rotten-

berg ed. 1981); Charles Brown, Curtis Gilroy & Andrew Kohen, "The Effect of the Minimum Wage on Employment and Unemployment," 20 *J.Econ.Lit.* 487 (1982). It is not our business to try to resolve such a debate, and anyway the resolution would not decide this case. The relevant comity is a duty of forbearance not to individual Indians but to Indian governments, and it would be a conspicuous breach of comity to accuse the latter, as the Labor Department's lawyer came close to doing at the oral argument, of not being guided by a sincere concern for the best interests of the former. We must bear in mind also that the principal beneficiaries of the activities of the Great Lakes Indian Fish and Wildlife Commission are not the Commission's employees; they are the Indian fishermen, hunters, and gatherers whom the Commission serves and protects.

■ We realize that other general federal statutes regulating employment, notably ERISA and OSHA, have been applied to Indian agencies when, as in the present case, no treaty right was at stake. *Smart v. State Farm Ins. Co., supra*, 868 F.2d at 933–36; *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113 (9th Cir.1985); *U.S. Dept. of Labor v. OSHRC*, 935 F.2d 182 (9th Cir.1991); *Lumber Industry Pension Fund v. Warm Springs Forest Products Industries*, 939 F.2d 683 (9th Cir.1991). But the employees in those cases were engaged in routine activities of a commercial or service character, namely lumbering and health care, rather than of a governmental character. They were not law enforcement officers, who if they had been employed by a state or local government would have been exempt from the law. Similarly distinguishable is *Confederated Tribes v. Kurtz*, 691 F.2d 878 (9th Cir.1982), refusing to recognize an implied exemption from federal excise taxation for a tribal sawmill. We do not hold that employees of Indian agencies are exempt from the Fair Labor Standards Act. We hold only that those agencies' law-enforcement employees, and any other employees exercising governmental functions that when exercised by employees of other governments are given special consideration by the Act, are exempt. We have the support of the *Cherokee Nation*

**496**

case, cited earlier. Noting that Title VII of the Civil Rights Act of 1964 explicitly exempts Indian tribes but that the Age Discrimination in Employment Act does not, the Tenth Circuit held that it would read the Indian tribal exemption into the latter statute. The court was rectifying an oversight. We do the same today, actuated by the same purpose of making federal law bear as lightly on Indian tribal prerogatives as the leeways of statutory interpretation allow.

AFFIRMED.

COFFEY, Circuit Judge, dissenting.

The Secretary of Labor (the "Secretary") requested that the district court enforce a subpoena duces tecum on the Great Lakes Indian Fish and Wildlife Commission (the "Commission" or the "Indians").[1] The Secretary sought payroll records from the Commission in order that it might determine if the Commission was violating the Fair Labor Standards Act ("FLSA") through its failure to pay time and one-half to conservation wardens working overtime hours. *See* 29 U.S.C. §§ 201 *et seq.* The district court refused to enforce the subpoena. Accepting the argument of the Commission, the court ruled as a matter of law that the Commission was not subject to the FLSA because applying it to the Commission *would modify or affect off-reservation rights to fish, hunt and gather guaranteed by treaties between the United States and the Indian tribes.*

## I. *PUBLIC AGENCY LAW ENFORCEMENT EXCEPTION*

The majority has chosen to affirm the dismissal of the subpoena on completely different grounds stating that the Commission's conservation wardens are "in fact a combination of game wardens and policemen" and thus, exempt from the FLSA. At 492; *see*

---

1. The Commission was created in 1984 by 13 tribes of Chippewa Indians to enforce the tribes' fishing, hunting and gathering rights in Michigan, Minnesota and Wisconsin.

2. The majority contends that state and local law enforcement officers "have no federal legal entitlement to time and a half for overtime [and that] their employer would be free within broad limits

29 U.S.C. § 207(k) (exempting employees of public agencies engaged in law enforcement activities). The majority relies principally on an ill-advised concession made at oral argument by counsel for the Department of Labor that "the difference in treatment between these tribal law enforcement officers and state or local policemen makes no sense." At 493. This reliance is misplaced, however, for the very language of the "law enforcement exception" in the FLSA requires that law enforcers be employees of a "public agency":

> "(k) Employment by *public agencies* engaged in fire protection or *law enforcement activities*
>
>> No public agency shall be deemed to have violated (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities...."

29 U.S.C.A. § 207(k) (West Supp.1993) (emphasis added).[2] Congress clearly defined "public agency" to mean "the government of the United States; the government of a state or political subdivision thereof; any agency of the United States (including the U.S. Postal Service and Postal Rate Commission), a state, or political subdivision of a state; or any interstate governmental agency." 29 U.S.C. § 203(x). The majority has not directed us to any statutory provision, much less any case law holding that an Indian tribe in general, or the Commission in this case, fits within the parameters of the statutory definition of a public agency in 29 U.S.C. § 203(x) or 29 U.S.C. § 207(k). In fact, the majority concedes that a literal interpretation of 29 U.S.C. § 207(k) fails to include the Indian conservation wardens in the law enforcement exception, *see* at 493 ("the Commission is not a state or local agency"). It is obvious, as the Department of Labor assert-

---

not only to substitute compensatory time off for overtime premium pay put also to measure hours worked by a work month rather than a work week...." At 492–93. This statement ignores the very fact that state and local law enforcement officers undoubtedly have rights secured through collective bargaining that define compensation and limit hours of employment.

ed at oral argument, that the plain language of the public agency law enforcement exemption does not include Indians. Not only do the Commission conservation wardens fail to meet the requirement of being employees of a public agency, but I take issue with the majority's description of the Indian special conservation wardens as police officers. It was premature for the Department of Labor's attorney to concede that they were like police when in truth and fact they are not.[3] The majority places far too much emphasis on the attorney's concession for she can hardly concede that which is contrary to the law.

It is a misnomer to refer, as the majority does, to the wardens as "Indian police" for the record is completely lacking of any evidence that these Indian special conservation wardens possess general police powers to arrest violators of state criminal statutes like murder, burglary, robbery, auto theft or local ordinances as police officers do. The limited deputization agreement between the Great Lakes Indian Fish and Wildlife Commission and the State of Wisconsin's Department of Natural Resources ("DNR"), to which the majority refers, fails to empower Commission special conservation wardens with the general powers of arrest entrusted to policemen. In fact, by statute, the Commission wardens do not even possess the limited power of arrest that full-time DNR wardens may exercise. *See* Wis.Stat.Ann. § 29.05(2) (*"[t]he authority granted in this section [additional arrest powers] does not apply to county conservation wardens or special conservation wardens"*) (emphasis added). Moreover, the limited authority to enforce only state conservation laws that the Indian special conservation wardens do possess may only be exercised when in uniform or when they are on duty and upon presentation of proper identification. This is in sharp contrast to the general powers of arrest possessed by duly sworn and trained public police officers who when not on official duty

status are bound to take action concerning the enforcement of state laws within their area of jurisdiction twenty-four hours a day if a criminal violation takes place in their presence. To be exempted from the FLSA, the Department of Labor requires that employees engaged in law enforcement activities be

> "empowered by State statute or local ordinance to enforce laws designed to maintain public peace and order and to protect both life and property from accidental or willful injury, and to prevent and detect crimes...."

> \*    \*    \*    \*    \*    \*

> "Typically, employees engaged in law enforcement activities include city police; district or local police, sheriffs, under sheriffs or deputy sheriffs who are regularly employed and paid as such; court marshals or deputy marshals; constables and deputy constables who are regularly employed and paid as such; border control agents; state troopers and highway patrol officers."

29 CFR § 553.211(a)(1); (c) (1993). Because the Commission conservation wardens are without statutory authority to act as police officers possessing the full panoply of general arrest powers, I think it is premature for this *court to hold they qualify for the public agency law enforcement exception based solely upon an uninformed concession at oral argument and without the benefit of a complete record.*

The majority also finds support for its holding in the fact that the Commission conservation wardens' enforcement activities are seasonal in nature. This statement is overbroad and fails to accurately reflect their duties and responsibilities. Fishing occurs at various times throughout the year, deer, bear, small game and bird hunting takes place in the fall and winter, while wild rice gathering takes place in the late summer and maple syrup collecting in the winter.[4] Thus

---

**3.** When initially questioned at oral argument about the function of the Commission conservation wardens, she responded "they're essentially fish and game wardens ... they enforce restrictions on tribal harvesting of fish and game." However, under persistent prodding from the bench she stated "yea, they're law enforcement

officials in a specialized way." Such a begrudging admission is hardly a firm foundation for an appellate opinion.

**4.** The treaty usufructuary rights also include gathering. Wild rice and maple syrup are just two of the products the Indians gather.

the wardens are required to work throughout the year not just in short periods as the majority suggests. *See* at 493 ("[t]he work of the Commission is seasonal because the usufructuary rights that it administers are seasonal"). Additionally, if the State of Wisconsin DNR had intended its contract with the Great Lakes Indian Fish and Wildlife Commission (the deputization agreement) to classify these Indian special conservation wardens as police with full police powers, it could have done so expressly as it did with the truly seasonal police force at the Wisconsin State Fair Park. *See* Wisc.Stat.Ann. § 42.-01(2) ("The state fair park board shall exercise police supervision over state fair park, and its duly appointed agents or representatives may arrest, with or without warrant, any person within such park area, committing an offense against the laws of the state or the rules of that board ..."). The State obviously had no interest in classifying the Indian wardens as police or it would have invested the Indian wardens with the same authority as it did the Wisconsin state fair police and provided for the same in its contract with the Commission.

The majority's willingness to expand the "law enforcement" exception to include Indian special conservation wardens is inconsistent with the U.S. Supreme Court's holding in *Citicorp Indust. Credit, Inc. v. Brock*, 483 U.S. 27, 35, 107 S.Ct. 2694, 2699, 97 L.Ed.2d 23 (1987), in which the Court was unwilling "[t]o extend an exemption to other than those 'plainly and unmistakably within [the FLSA's] terms and spirit.'" *Id.* (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945)). *Brock* went on to declare "where the FLSA provides exemptions 'in detail and with particularity,' we have found this to preclude 'enlargement by implication.'" *Id.* (quoting *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944)).[5] The majority is attempting to justify such an "enlargement by

implication" through its bootstrapping argument holding that because Indian wardens are like police, Congress must have intended the "law enforcement" exception to include Indians even though they are not employees of a "public agency." The majority's reading of the statute might very well lead to bank guards, shopping mall security guards or campus police, who also possess very limited powers but lack general powers of arrest, also qualifying for the law enforcement exception. I cannot join in this expansion of the clear and unambiguous statutory language (29 U.S.C. § 207(k)), for rewriting the statutes duly enacted by the U.S. Congress is not the prerogative of a three-judge panel of the Seventh Circuit Court of Appeals. "The plain meaning of legislation should be conclusive, except in the 'rare case [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *see also Connecticut Nat'l Bank v. Germain*, —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (holding that "when the words of a statute are unambiguous, ... 'judicial inquiry is complete'") (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)); *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1270 (7th Cir.1993) ("We refuse to read into the statute what Congress declined to include. '[W]e must assume Congress understood the meaning of the words it incorporated into the [Act].'") (quoting *Jones v. Hanley Dawson Cadillac Co.*, 848 F.2d 803, 807 (7th Cir.1988)).

The majority further attempts to justify its end run around the plain language of the statute by arguing that the FLSA was drafted in 1938 when Indian concerns "were not at the forefront of the national policy agenda." At 493. This argument, however, ig-

---

**5.** The majority attempts to distinguish *Brock* by stating that the Supreme Court did not just look at the plain language of the statute but it also examined "legislative intent." This observation ignores the very holding of the case in which the Court *refused to* "extend an exemption to other

than those *'plainly and unmistakably within [the FLSA's] terms and spirit.'"* *Brock*, 483 U.S. at 35, 107 S.Ct. at 2699 (quoting *A.H. Phillips, Inc.*, 324 U.S. at 493, 65 S.Ct. at 808) (emphasis added).

nores the fact that for the past fifty-five years Congress has had the opportunity but has not seen fit to amend the FLSA during a period when Indian problems have been under the all powerful search light of frequent congressional oversight. Because I disagree with the majority's holding that the Indian wardens are exempted from the FLSA by 29 U.S.C. § 207(k) (public agency law enforcement exemption), it is necessary to determine whether applying the FLSA to the Indians would interfere with rights guaranteed by Indian treaties. *See Smart v. State Farm Insurance Co.*, 868 F.2d 929, 932–33 (7th Cir.1989); *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985).

## II. *APPLICATION OF THE FLSA TO THE INDIANS*

In *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960), the U.S. Supreme Court stated that a "general statute in terms of applying to all persons includes Indians and their property interests." Likewise, this court has stated "[g]eneral statutes, ... whose concerns are widely inclusive and do not affect traditional Indian or Tribal rights, are typically applied to Indians." *Smart*, 868 F.2d at 932. A statute of general applicability does not apply to the Indians if: "(1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservation...." *Id.* (quoting *Coeur d'alene Tribal Farm*, 751 F.2d at 1116) [hereinafter the *Smart* analysis].[6]

There is little doubt that the Fair Labor Standards Act is a statute of general applicability for the Act covers employees "engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 206(a), as well as "individuals employed by a public agency." *Id.* § 203(e)(2). The Supreme Court "has

consistently construed the [FLSA] 'liberally, to apply to the furthest reaches consistent with Congressional direction,' recognizing that broad coverage is essential to accomplish" its goals. *Tony and Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 211, 79 S.Ct. 260, 263, 3 L.Ed.2d 243 (1959)). Given Congress' plenary powers under the Commerce Clause and the judiciary's broad definition of commerce, without question the FLSA must be interpreted as a statute of general applicability. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1947) (discussing the goal of the FLSA).

Before engaging in the *Smart* analysis, we must attempt to determine what, if any, treaty rights are at stake. At oral argument, counsel for the Commission was unable to answer and vacillated in an exercise of futility when asked to identify what specific right would be impaired by compliance with the subpoena or compliance with the requirements of the FLSA. Ultimately, he claimed that the FLSA would negatively impact the Indians' right to fish, hunt and gather (collectively "usufructuary rights") on lands ceded to the States of Michigan, Minnesota and Wisconsin in a series of treaties dated 1836, 1837, 1842, and 1854. Just how the requirements of the FLSA would impair treaty rights he was unable to answer. Secondly, he claimed that having to comply with the FLSA rules would impose a financial burden that would inhibit the Commission's ability to manage and regulate the off-reservation usufructuary rights but gave no compelling examples of how this would inhibit regulation of treaty rights.

After reading the record and briefs as well as reviewing the oral argument tape, I remain *unconvinced* that applying the rules of the FLSA to the Commission *would impact the Indians' usufructuary rights*. Regarding the argument that the FLSA might affect

---

**6.** This analysis, of course, is unnecessary when Congress specifically declares that a statute exempts Indians. *See, e.g.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b)(1) (1988); The Americans with Disabilities Act, 42 U.S.C. § 12111(5)(B)(i) (West Supp.1993).

the Commission's pay-scale or employment of conservation wardens, the majority stated,

> "one searches the treaties in vain for [a right to employ conservation wardens]. So far as pertains to this case the only rights granted are rights to hunt, fish, and gather. There is no mention of the system for enforcing these rights, let alone any reference to the terms of employment of those hired to enforce it."

At 493. The majority later adds that "there is no treaty right to employ law enforcement officers on whatever terms the tribal organization sets and the officers are willing to accept...." At 494. Not only do the treaties fail to create a right to employ Indian conservation wardens as the majority concedes, there is also no indication in the treaties or in the deputization agreement between the State of Wisconsin and the Commission expressing an intent to provide for the alleged "policemen" that the majority has created. As I will explain, application of the FLSA to the Indian special conservation wardens will have only an indirect impact, if any, on the Commission. The Commission has failed to delineate any direct interference with treaty rights nor does the record before us identify that a direct interference with treaty rights will occur.

I am likewise unpersuaded by the Commission's argument that the FLSA would impose a financial burden on the Indians that will jeopardize treaty rights. This broad, ever-expanding, all-inclusive and speculative umbrella allegation that legislation will "impact treaty rights" must have some limits. The federal courts cannot continue to be held captive by allegations based on pure conjecture. I, for one, believe the trial court's refusal to enforce the subpoena is the straw that breaks the proverbial camel's back. Whether the FLSA would result in a significant financial burden to the Commission is a fact that is unknown and will remain unknown until such time as the government has had an opportunity to review and examine the Commission's payroll records to determine the number of wardens, their hours, as well as the compensatory time and payment policies of the Commission. Any argument to the contrary is nothing but pure specula-

tion. Certainly, the Commission's creative allegation that the FLSA will have a negative financial impact is insufficient to refuse enforcement of the administrative subpoena because financial impact alone is not one of the factors that we must consider when determining whether a statute covers the Indians. *See Smart*, 868 F.2d at 932–33 (asking whether "(1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservation ...."). The concern of the *Smart* test is whether treaty rights are abrogated, not whether a statute will introduce a modest economic burden. The record before us and the oral argument are devoid of any evidence put forth by the Commission of a treaty right that would be abrogated by the FLSA. Nonetheless, because the Commission claims the FLSA would modify the usufructuary rights guaranteed by the treaties, it is incumbent upon me to refute this allegation with the required application of the *Smart* analysis.

Application of the *Smart* doctrine to the facts in the case before us is lacking in the majority opinion. Rather than employing the test adopted by this court to determine whether a federal statute of general applicability covers the Indians, i.e. *Smart*, the majority has opted to defer to a concern for comity. The majority states "[t]he idea of comity—of treating sovereigns, including such quasi-sovereigns as states and Indian tribes, with greater respect than other litigants—counsels us to exercise forbearance in construing legislation to intrude upon the central regulatory functions of a sovereign entity." At 495. I do not dispute, and in fact, agree with the theory that "comity is a proper consideration in statutory interpretation," *id.*, but I object to invoking the theory as a substitute for the very analysis we have adopted for determining when and if comity is appropriate. The very fact that we have a test (*Smart*) to determine when a statute of general applicability applies to the Indian population assumes that some federal regulatory statutes cover Indians unless there is an

express exemption. *Smart,* 868 F.2d at 932 ("[g]eneral statutes ... whose concerns are widely inclusive and do not affect traditional Indian or Tribal rights, are typically applied to Indians"); *see, e.g., Lumber Industry Pension Fund v. Warm Springs Forest Products Industries,* 939 F.2d 683 (9th Cir.1991) (applying ERISA to an Indian enterprise); *United States Dep't of Labor v. Occupational Safety & Health Rev. Comm'n (OSHRC),* 935 F.2d 182, 186–187 (9th Cir.1991) (applying OSHA to Indian businesses); *Smart,* 868 F.2d at 932–36 (applying ERISA); *Coeur d'Alene Tribal Farm,* 751 F.2d at 1115 (applying OSHA to tribal business). Although *Smart* acknowledges that the United States has given specified but limited rights to the Indians through treaties, neither *Smart,* nor any other case, has held that treaty rights prevail over subsequent legislative enactments of the United States Congress.[7] In fact, *Smart* held that *"[f]ederalism uniquely concerns States; there simply is no Tribe counterpart." Smart,* 868 F.2d at 936 (emphasis added). The implication of this language is obvious, *comity has never been applied in prior case law as a principle that should dictate outcomes in conflicts between federal legislation and Indian Treaty rights.* For this reason, *Smart,* which we are bound to follow, set forth three inquiries to determine whether a statute of general applicability governs the Indians. The majority's unique approach of invoking the general principle of comity is unsupported in judicial precedent and must not replace the step-by-step application of *Smart* to the facts before us.

### A. *Tribal Self-governance*

As explained above, a statute of general applicability excludes the Indians if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) application of the law would abrogate treaty rights; or (3) the legislative history reveals a clear congressional intent not to cover the Indians. *Smart,* 868 F.2d at 932–33. The district court, applying a very watered down

test, found that FLSA coverage of the Commission "would impinge upon one of the tribes' most essential aspects of self-governance: their ability to manage and regulate their exercise of their treaty rights." *Martin v. Great Lakes Indian Fish and Wildlife Comm'n,* No. 92–C–409–C, 1992 WL 300841 at *9, 1992 U.S. Dist. LEXIS 15883, at *24 (W.D.Wis. Oct. 7, 1992). The district court was mistaken on two counts. Even if there was a treaty right to regulate usufructuary rights (which there is not), the Commission's right to enforce and manage those usufructuary rights is neither "exclusive" nor "purely intramural," as required under *Smart.*

### 1. *Lack of Exclusivity*

The absence of exclusivity regarding tribal self-governance is evident from the fact that tribal enforcement and regulation of off-reservation usufructuary rights is shared with the states. State regulation of Indian usufructuary rights falls under the state's police power to protect its natural resources and its citizens; *Lac Courte Oreilles v. Wisconsin,* 668 F.Supp. 1233, 1237 (W.D.Wis.1987) *(LCO IV),* hence, tribal usufructuary rights are subject to state regulation in the interests of conservation and public health and safety. *Lac Courte Oreilles v. Wisconsin,* 760 F.2d 177, 183 (7th Cir.1985) *(LCO II); LCO IV,* 668 F.Supp. at 1235–39. As the case law above makes clear, the tribes' right to regulate off-reservation activities is by no means exclusive but must be shared with the states. *LCO IV,* 668 F.Supp. at 1241 (" 'ordinarily the state and the tribe possess concurrent power to regulate ...' ") (quoting *United States v. Washington,* 520 F.2d 676, 686 n. 4 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976)). For instance, Wisconsin Department of Natural Resources ("DNR") conservation wardens are authorized to issue citations to tribal members for violating tribal fishing regulations, *Lac Courte Oreilles v. Wisconsin,* 707 F.Supp. 1034, 1038 (W.D.Wis.1989) *(LCO VI).* DNR wardens may likewise "observe and monitor any walleye or muskellunge harvest-

---

7. "[Indian] sovereignty is not absolute, for Congress has plenary power to limit, modify or even eliminate the powers of self-governance which Tribes may have traditionally pos-

sessed.... Unlike the States, Indian Tribes possess limited sovereignty, subject to complete defeasance by Congress...."
*Smart,* 868 F.2d at 932 (citations omitted).

ing plaintiffs undertake by spearing or netting." *Id.* at 1060. Concurrent State enforcement of off-reservation usufructuary rights also applies to hunting fur bearing animals and small game, *Lac Courte Oreilles v. Wisconsin,* 740 F.Supp. 1400, 1402, 1413 (W.D.Wis.1990) *(LCO VII),* gathering miscellaneous forest products, *Lac Courte Oreilles v. Wisconsin,* 758 F.Supp. 1262, 1275–76 (W.D.Wis.1991) *(LCO IX),* and enforcing state boating laws. *Lac Courte Oreilles v. Wisconsin,* 775 F.Supp. 321, 325 (W.D.Wis. 1991) *(LCO X).* The preceding authorities make it quite obvious that the Commission never possessed the exclusive right to regulate off-reservation usufructuary rights and thus does not qualify for exemption from FLSA on the grounds that the FLSA would impinge upon rights of self-governance.[8]

### 2. *Not Purely Intramural Matter*

Secondly, as is likewise evident from the above-cited authorities, the Commission special conservation wardens' activities are not "purely intramural" as the off-reservation usufructuary rights necessarily involve both Indians and non-Indians. (When engaging in off-reservation fishing, hunting and gathering, the individual Indians exercising these rights commonly come in contact with non-Indians). The Supreme Court and this court have determined that "purely intramural" matters include things like determining tribal membership, domestic relations, and rules of inheritance. *Montana v. United States,* 450 U.S. 544, 563–65, 101 S.Ct. 1245, 1257–58, 67 L.Ed.2d 493 (1981); *Smart,* 868 F.2d at 932; *Coeur d'Alene Tribal Farm,* 751 F.2d at 1116. In *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), the Court stated that Indian tribes had lost many attributes of sovereignty including those areas "involving the relations between an Indian tribe and non-members of the tribe...." *Id.* at 326, 98 S.Ct. at 1087. It is rather obvious that off-reservation fishing, hunting and gathering involve relations between Indians and non-Indians and thus by definition are not "purely intramural." *See id.* Furthermore, exercise of these usufructuary rights is quite distinct from determining tribal membership, domestic relations and rules of inheritance (functions the courts have deemed "purely intramural").

The Supreme Court recently reaffirmed the principle of limited tribal sovereignty in *South Dakota v. Bourland,* —— U.S. ——, ——, 113 S.Ct. 2309, 2319, 124 L.Ed.2d 606 (1993), stating "the 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.'" (quoting *Montana,* 450 U.S. at 564, 101 S.Ct. at 1258). The Commission should not be able to wave an unbridled umbrella of "treaty rights" and avoid application of federal legislation that has as its purpose the elimination of "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers...." 29 U.S.C. § 202. Without explanation, the district court has stretched the principle of tribal self-government in holding that "[t]o the extent that [the Commission] is required to take into account the Fair Labor Standards Act in deciding how to deploy its wardens, its ability to exercise its treaty rights is affected directly and critically." *Martin,* 1992 WL 300841 at *8, 1992 U.S. Dist. LEXIS 15883 at *22. The district court's emphatic language fails to disguise its lack of reasoning. There simply is no evidence in the record that rights of self-governance are in jeopardy. Because the Commission's regulation of off-reservation usufructuary rights is neither exclusive nor intramural, the district court improperly held that the FLSA impinged upon tribal self-governance. Indeed, the impact of the

---

**8.** The extensive regulation of off-reservation usufructuary rights by the State of Wisconsin recognized in the *Lac Courte Oreilles* cases confirms the fact that the federal government—with its greater authority to regulate Indians—may apply the less intrusive burdens of the FLSA to the Commission. *See e.g., Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978) ("Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess"); *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

FLSA on off-reservation treaty rights will likely be much less significant than that of the above-cited State conservation and safety laws.

## B. *Abrogation of Treaty Rights*

When considering whether federal legislation abrogates treaty rights this court stated in *Smart* that "[s]imply because a treaty exists does not by necessity compel a conclusion that a federal statute of general applicability is not binding on an Indiana tribe.... The critical issue is whether application of the statute would *jeopardize* a right that is secured by the treaty." *Smart*, 868 F.2d at 934–35 (emphasis added). The language in *Smart* is plainly at odds with the district court's application of *Smart* to the facts before us. If any modification of a treaty right barred application of a federal statute with general applicability (like the FLSA), then the principle from *Tuscarora Indian Nation*, 362 U.S. at 116, 80 S.Ct. at 553, that general statutes apply to Indians would be cast aside and eviscerated. That a statute must do more than "modify" a treaty right for the Indians to be exempted is evident from the fact that on several occasions courts have applied general federal statutes to the Indians. *See Lumber Industry Pension Fund v. Warm Springs Forest Products Industries*, 939 F.2d 683 (9th Cir.1991) (applying ERISA to an Indian enterprise); *United States Dep't of Labor v. Occupational Safety & Health Rev. Comm'n (OSHRC)*, 935 F.2d 182, 186–187 (9th Cir.1991) (applying OSHA to Indian businesses); *Smart*, 868 F.2d at 932–36 (applying ERISA); *Coeur d'Alene Tribal Farm*, 751 F.2d at 1115 (applying OSHA to tribal business); *Confederated Tribes of Warm Springs Reservation v. Kurtz*, 691 F.2d 878 (9th Cir.1982) (holding that tribes and their members are subject to federal excise taxes unless express exemption appears), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983); *Fry v. United States*, 557 F.2d 646 (9th Cir.1977) (applying federal tax laws to Indian businesses), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978); *United States v. Burns*, 529 F.2d 114 (9th Cir.1975) (holding that federal gun control law applies to Indians). In *OSHRC*, the Indians maintained that their treaty right to

exclude non-Indians from the reservation barred applicability of the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678 (1988), to an on-reservation sawmill. The Ninth Circuit held that the conflict between a statute (OSHA) and a treaty right must be "direct" rather than attenuated to prevent the application of a general federal statute to the Indians. *OSHRC*, 935 F.2d at 186. The requirement for a direct conflict between a treaty and statute is reflected in U.S. Supreme Court decisions asking whether the statute *abrogates* treaty rights. *See United States v. Dion*, 476 U.S. 734, 738–40, 106 S.Ct. 2216, 2219–20, 90 L.Ed.2d 767 (1986) (holding that the Eagle Protection Act "abrogates" treaty right to hunt eagles); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690, 99 S.Ct. 3055, 3076, 61 L.Ed.2d 823 (holding that international fishing treaty does not "abrogate" Indian fishing rights), *modified*, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979); *Coeur d'Alene Tribal Farm*, 751 F.2d at 1116 (requiring that the federal statute "abrogate" treaty rights rather than just modify them).

Application of the FLSA to the Commission conservation wardens will have no greater effect on Indian treaty rights than application of other federal regulatory statutes like ERISA and OSHA which the courts have already upheld. It is evident that the Department of Labor is merely trying to prevent the Indian employees of the Commission from being treated as second-class citizens by assuring that they receive the same protection as all other employees covered under the Act. Certainly the mere fact that Department of Labor inspectors merely request through the power of subpoena the right to examine payroll records cannot of itself constitute abrogation of treaty rights. Thus I am in agreement with the Department of Labor's contention at oral argument that enforcement of the administrative subpoena and application of the FLSA to the Commission would have no direct impact on the Indians' rights to hunt, fish and gather.

In the case before us, the Commission has failed to set forth much less document any logical reason or evidence of how submitting

to an administrative subpoena or to the Fair Labor Standards Act will have any direct impact on a treaty right. Just because the Commission has invoked the ever-expanding umbrella of "impact on treaty rights" to challenge application of the FLSA does not mean that we should abandon sound jurisprudence in addressing the conflict. The courts must not cave in to the ever-growing, all-expansive claim that treaty rights are affected unless the claimants initially identify what specific treaty right is at stake and how it is affected. When a federal statute allegedly comes in conflict with Indian treaty rights, the case law mandates that we apply a legal standard to ascertain if the alleged treaty right exists and whether it is in fact abrogated. The mere possibility that application of the FLSA to Commission conservation wardens may require the Commission to alter employment practices or pay additional wages certainly falls far short of jeopardizing usufructuary rights guaranteed by treaties much less abrogating them. Without further development of the record we will never know if applying the FLSA to the Commission will abrogate treaty rights; however, it is certain, based on the evidence presented, that the Commission has failed to delineate any treaty rights that would be abrogated by the FLSA.

Finally, as the majority acknowledges, nothing in the legislative history evinces a congressional intent to exempt the Indians from the FLSA; at 493. As the foregoing discussion makes clear, the Commission has failed to establish any one of the three grounds in *Smart* for exempting Indians from the FLSA. Accordingly, I am of the opinion that it was premature for the district court to rule as a matter of law that the Commission is not subject to the FLSA.

### III. *CONCLUSION*

I am unpersuaded by the majority's attempting to make a well-reasoned argument based on case law and the statute to classify Indian special conservation wardens as policeman exempted from 29 U.S.C. § 207(k) because: (1) the Indian wardens are not employees of a public agency, (2) they do not have the general arrest powers of policemen, and (3) had the State of Wisconsin desired to bestow full police powers on the Indian wardens, it could have easily done so just as it did with the seasonal police force at the state fair grounds. Not only do the wardens fail to qualify for the public agency law enforcement exemption, but application of the *Smart* test reveals that the Fair Labor Standards Act will not abrogate the Commission's treaty rights. Thus, the prudent and proper disposition of this case is to remand it for further proceedings pursuant to Circuit Rule 36, with instructions to enforce the Department of Labor subpoena. Only after compiling a complete record may the district court or this court properly determine whether the Fair Labor Standards Act abrogates tribal treaty rights. I respectfully

Dissent.