In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1051

LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA
  INDIANS OF WISCONSIN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

STATE OF WISCONSIN, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:74-cv-00313-bbc — **Barbara B. Crabb**, *Judge*.

ARGUED SEPTEMBER 16, 2014 — DECIDED OCTOBER 9, 2014

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs, Wisconsin Indian tribes, moved the district court under Fed. R. Civ. P. 60(b)(5) to relieve them from a final judgment on the ground that its continued enforcement would be, in the language of the rule, "no longer equitable." There is no deadline for moving for relief under this provision, though a party must move

within a reasonable time. See Fed. R. Civ. P. 60(c)(1). The district court denied the motion, precipitating this appeal.

The judgment in question, entered in 1991 and not appealed, upheld a state statute prohibiting members of the tribes from hunting deer at night outside the tribes' reservations. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 775 F. Supp. 321, 324 (W.D. Wis. 1991). Wisconsin Indians had hunted deer at night since before they had electricity. Hunting deer at night is efficient because deer are more active at night, and because a bright light in a deer's visual field freezes the animal, making him a large stationary target. According to proposed findings of fact submitted by the plaintiffs, "tribal members need to hunt for subsistence purposes. Between 25% and 93% of Tribal members are unemployed. Many Tribal members that are employed still live below the poverty level." (Twenty-eight percent of the state's Indian population have incomes below the poverty level. Suzanne Macartney et al., "Poverty Rates for Selected Detailed Race and Hispanic Groups by State and Place: 2007–2011" 14 (Feb. 2013), www.census.gov/prod/2013 pubs/acsbr11-17.pdf (visited Oct. 8, 2014, as were the other websites cited in this opinion).) Deer meat also is lean and therefore healthful (obesity is far more prevalent among Indians than among whites, see American Heart Association, *American Indian/Alaska Natives & Cardiovascular Diseases* (2013), www.heart.org/idc/groups/heart-public/@wcm/@sop/ @smd/documents/downloadable/ucm_319569.pdf). According to the plaintiffs "a disproportionate number of Tribal members have chronic diseases such as heart disease and diabetes. Cheap, high fat hamburger meat purchased with food stamps cannot replace healthy venison in tribal populations experiencing chronic health problems," and in addition

"tribal members need to hunt at night for cultural and religious reasons. Fresh deer meet [*sic*] may be needed for a ceremony, and the only opportunity to obtain it may be at night."

As shown in the map below, reservation lands in Wisconsin are limited and scattered. But much of the northern third of Wisconsin that is not reservation land (the solid black regions of the map) is territory ceded by the Indian tribes to the United States in the nineteenth century (as marked by the shaded region of the map). The treaties that governed the terms of the cession reserved the Indians' rights to hunt in the ceded territory. For example, a treaty of 1842 provided that "the Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States." See *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 345 (7th Cir. 1983).



Though the treaties do not mention the states, states are allowed to regulate Indian activities in ceded territory so far as necessary "to protect [the state's] natural resources and its citizens." *Reich v. Great Lakes Indian Fish & Wildlife Commission*, 4 F.3d 490, 501 (7th Cir. 1993). State jurisdiction over Indians is limited but includes the right to take measures necessary to protect public safety, *id.*, and safety concerns were the justification given by Wisconsin for wanting to

prohibit Indians from hunting deer at night outside their reservations. But the state must justify, not merely assert, a public-safety need to restrict Indian rights recognized by treaty with the federal government. It must show, first, "that a substantial detriment or hazard to public health or safety exists or is imminent. Second, … that the particular regulation sought to be imposed is necessary to the prevention or amelioration of the public health or safety hazard. And third, … that application of the particular regulation to the tribes is necessary to effectuate the particular public health or safety interest. Moreover, the state must show that its regulation is the least restrictive alternative available to accomplish its health and safety purposes." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 668 F. Supp. 1233, 1239 (W.D. Wis. 1987); see also *Mille Lacs Band of Chippewa Indians v. Minnesota*, 952 F. Supp. 1362, 1381–82 (D. Minn. 1997).

In and before 1989, which was when the evidence was presented on which the 1991 judgment was based, there had been very little night hunting of deer other than on Indian reservations. Occasionally law enforcement officers or employees of the state's department of natural resources would shoot deer at night, but this was rare, the reason being that night hunting was considered dangerous, although there appears to have been no evidence supporting that fear.

The tribes' motion to reopen the 1991 judgment is based largely on the fact that beginning in the late 1990s the number of deer killed at night, mainly by state employees though also by some private state contractors, increased markedly because of an explosion of the deer population and the advent of chronic wasting disease, a fatal disease common

among deer. Night hunting was meant to reduce the deer population in general (one reason being that deer are frequent causes of serious traffic accidents) and to eradicate chronic wasting disease in particular. The tribes' argument is that the state's greater experience with night hunting of deer since the 1991 judgment shows that it is safer than had been believed—so safe indeed that, given sensible regulations governing such hunting, there is no reason to prohibit the tribes' members from engaging in such hunting on ceded territory. Hunting accidents in general have plummeted in Wisconsin in recent years: from just over 100 in 1989 to 28 in 2012. The latter number is particularly striking since Wisconsin's population in 2012 was 5.7 million and hunting is popular in that largely rural state.

The district judge rejected the tribes' argument on several grounds. One was that most of the increased night hunting has been by employees or contractors of the state government. But there is no evidence that the safety regulations that the tribes intend to impose on off-reservation night hunting are laxer than the regulations governing night hunting by the state's hunters. (In fact the opposite is true, as we'll see.) The safety record of deer hunting on reservations is outstanding. According to an uncontradicted expert witness's report, though there are no regulations specific to night hunting on the reservations (where night hunting is lawful) there have been only two reported incidents of a person being shot by a deer hunter, either day or night. Furthermore, there's no evidence that the state agents who hunt deer at night are experienced or well-trained. Apparently many are neither. In 2006 the state's department of natural resources noted that "shooters are coming to this program [eradication of chronic wasting disease by night hunting] ill

prepared. … Too many do not know the basic rules of fire-arms safety. … Our trainees come from within the ranks of the department [of natural resources] and the vast majority are not seasoned shooters … ." In contrast, those Indians who hunt deer tend to be experienced hunters, because on their reservations they are allowed to hunt both during the day and at night. Moreover, to be licensed to hunt they are required to pass a marksmanship test—at night. Their safety record is sterling: since 1989 there have been only two or three recorded hunting accidents involving Indians in ceded territory. According to another expert witness's report, the tribes' proposed permit requirements for nighttime deer hunting are far more stringent than those the state imposes on its hunters.

The judge remarked that "the chronic wasting disease initiative is some evidence that night hunting with lights can be engaged in safely but it is not conclusive in that regard. I cannot say that it shows that the judgment in this case has become 'an instrument of wrong.'" It's not clear what evidence would demonstrate "conclusively," in advance of permitting the hunting of deer at night by members of the plaintiff tribes, that such hunting was safe. All that can be said is that on the present record there is scant reason to think that safety concerns justify forbidding Indians to hunt deer at night in the thinly populated (by human beings) northern part of Wisconsin that consists of territory that the tribes ceded to the United States long ago. There are of course hunting accidents, but they are mainly to members of the shooting party—often they are self-inflicted wounds—rather than to bystanders. Between 2007 and 2011 there were 133 hunting-related injuries of which 48 were self-inflicted. Of the remaining 85 accidents, only 4 were to non-hunters—

either bystanders or non-hunting members of the hunting party.

The night hunter doesn't shoot until the deer is a brightly lit stationary object—a perfect target. Hunting deer during the day is likely to be more dangerous because there are more people about and the hunter will often be shooting at a moving animal, which a shooter is more likely to miss than a stationary one. It's true that at night the hunter may well have greater difficulty seeing a person in the woods behind the deer that he's aiming at—and bullets fired from the high-powered rifles used to hunt deer carry a long way if they happen to miss the targeted deer. But in recognition of this danger the hunting regulations proposed by the tribes require the night-hunting Indians to lay out lines of sight in the daytime and submit a shooting plan for approval. Unless a hunter plans to fire from an elevated position (when because of the angle the bullet is likely to hit the ground within a safe distance), a member of the tribal conservation department or the tribe's internal regulatory agency must travel to the site and confirm that the shooting plan complies with safety standards. Further mitigating the danger is that one of the plaintiff's expert witnesses reports that there are very few people out and about at night in the ceded territory during the night deer-hunting season, which runs from November 1 until the first Monday in January, with a break during the state's regular nine-day hunting season when there are likely to be more people out both day and night.

According to data compiled by Wisconsin state agencies, between 2008 and 2011 there was a total of 1851 injuries and deaths in collisions between motor vehicles and deer, and only 37 injuries and deaths from all accidents—day and

night—arising from the hunting of deer with guns, an average of 9 a year. Whether any of them were deaths from night hunting is unknown. But it is plausible—no stronger term is possible, given a dearth of evidence—that the more deer that Indians kill, the fewer deer-related accidents to humans there will be, since according to the statistics we quoted 98 percent of deer-related injuries arise from motor vehicle collisions with deer. Not that the effect will necessarily be large, though in 2013 Wisconsin hunters killed about 342,000 deer out of a population (before the hunting season) estimated at 1.4 million—24 percent of the deer population. See Deer-Friendly, "Wisconsin Deer News," www.deerfriendly. com/deer/wisconsin; Wisconsin Department of Natural Resources, "Total Deer Kill," http://dnr.wi.gov/topic/Wildli feHabitat/documents/deerharvest5.pdf. A further point concerning safety is that the very small Indian population (1 percent of Wisconsin's total population) imposes a natural limit on the potential risk of Indian night hunting to public safety.

The judge said that the fact "that plaintiffs waited ten years after the chronic wasting disease reduction program started and four years after it ended before moving to reopen the judgment … in itself might be good cause for denying their motion." Not so. The longer the wait, the more evidence is accumulated bearing on the safety of night hunting of deer. The plaintiffs filed their motion to reopen and modify the judgment in 2012; had they filed earlier they would have had a thinner statistical basis for their position. And it's not as if the state is harmed by delay in reopening the judgment.

A motion to modify a judgment under Fed. R. Civ. P. 60(b)(5) must, like any motion, be made in a reasonable time, since the rules specify no deadline. But what is reasonable depends on the circumstances. If reasonable reliance on a judgment is likely to grow over time, a motion to modify it should be made sooner rather than later. But in the case of regulatory decrees, such as the judgment in this case forbidding night hunting of deer, often the passage of time renders them obsolete, so that the case for modification or rescission actually grows with time, as in *Horne v. Flores*, 557 U.S. 433, 447–48 (2009), *People Who Care v. Rockford Board of Education*, 246 F.3d 1073, 1075–76 (7th Cir. 2001), and *Alliance to End Repression v. City of Chicago*, 237 F.3d 799, 801 (7th Cir. 2001). That's what seems to have happened in this case. Based on almost no experience with night deer hunting in the 1980s, the district court at the beginning of the next decade upheld on safety grounds Wisconsin's ban on off-reservation night deer hunting by Indians. Greater experience with deer hunting suggests that a total ban is no longer (if it ever was) necessary to ensure public safety. And as noted in *Reich v. Great Lakes Indian Fish & Wildlife Commission*, *supra*, 4 F.3d at 501, it is only safety (and conservation, which however is not an issue in this case) that can justify a state's forbidding a normal Indian activity, authorized to the tribes on land ceded by them to the United States.

At least four states allow Indians to hunt deer at night—Oregon, Washington, Minnesota, and Michigan. Neither the tribes nor the state has presented evidence of the accident rate in any of those states. We do not know whether such statistics are obtainable. They would prove to be of little value were there substantial differences among these states or between them and Wisconsin in such potentially relevant

domains as terrain, climate, deer population, location and size of ceded territory, the length and time of year of the night deer hunting season, safety regulations, Indian population as a percentage of total state population, population density, Indian cultural and dietary practices relating to deer hunting, poverty, and unemployment. But so far as we are able to determine there are few relevant differences among Minnesota, Michigan, and Wisconsin in these respects, though considerable differences between those three Midwestern states and Oregon and Washington. See, e.g., U.S. Department of the Interior, Bureau of Indian Affairs, *2013 American Indian Population and Labor Force Report* (Jan. 16, 2014), www.bia.gov/cs/groups/public///-024782.pdf. For example, tribal hunting in the ceded territories in Wisconsin, Minnesota, and Michigan is managed by the same organization, the Great Lakes Indian Fish and Wildlife Commission. And in developing their proposed regulations the Wisconsin tribes looked to Michigan and Minnesota, both states that have allowed night hunting for at least a decade, for guidance—although the proposed Wisconsin regulations are far more stringent than those of the other states. The Wisconsin tribes' night hunting safety course and certification program are identical to those of the Minnesota tribes. Moreover, the ceded territories in each of the three states (the upper peninsula of Michigan, the northern third of Wisconsin, and the east-central portion of Minnesota) are comparable in population density, elevation, biomass (*i.e.* tree concentration), and average temperature during the hunting season. So it seems reasonable that Minnesota's and Michigan's experiences with night hunting of deer by Indians might have a bearing on our case.

We'll leave it to the district court to decide whether to invite the parties to submit such comparative evidence. The burden of production should be placed on the state, for as the record stands the evidence presented by the tribes that night hunting for deer in the ceded territory is unlikely to create a serious safety problem provides a compelling reason for vacating the 1991 judgment that prohibited Indians from hunting deer at night in that territory.

The judgment is reversed and the case remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.